Douglas Ray MEEKS, Petitioner-Appellant,

v.

Michael W. MOORE, Respondent-Appellee.

No. 98-3693.

United States Court of Appeals,

Eleventh Circuit.

June 27, 2000.

Appeal from the United States District Court for the Northern District of Florida.(No. 80-0076-4-CV-MMP), Maurice M. Paul, Judge.

Before ANDERSON, Chief Judge, and TJOFLAT and BIRCH, Circuit Judges.

TJOFLAT, Circuit Judge:

Douglas Ray Meeks appeals an order of the United States District Court for the Northern District of

Florida denying his consolidated petition for a writ of habeas corpus.[1] *See* 28 U.S.C. § 2254.[2] We affirm.

I.

A.

On the morning of October 24, 1974, Meeks, a twenty-one-year-old African-American, entered the

Majik Market convenience store in Perry, Florida.[3] While attempting to rob the store, Meeks stabbed the

store manager, Chevis Thompson. Three high school students (James Southerland, Jeffrey McKee, and

Thomas Hingson) saw Meeks exit the Majik Market as they drove into the store's parking lot.[4] When the

---

[1]As indicated *infra,* in separate indictments Meeks was charged with murder and related offenses. After exhausting his appellate and post-conviction remedies, he petitioned the district court for writs of habeas corpus. The petitions were consolidated, and we hereafter refer to them as a single petition.

[2]Because Meeks filed his habeas petition in the district court before April 24, 1996, the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), the pre-AEDPA standard of review governs this appeal.

[3]Perry is located in Taylor County, Florida.

[4]One of the boys, James Southerland, recalled that he saw Meeks at between 11:15 a.m. and 11:30 a.m., because he remembered that they had gone to the Majik Market during their lunch hour; at Meeks' trial,

students went inside the Majik Market, they noticed that Thompson was lying behind the sales counter and that she was apparently injured. Upon closer inspection, the boys saw that blood was flowing out of a knife wound in her neck. Thompson was gasping for air and waiving her hand wildly. There was also blood on the counter and on the sides of the cash register.

Failing to find a telephone in the store, the boys raced to their car and drove three blocks to the nearest hospital. Before leaving, they instructed two other students (Dennis Wilds and Michael Blanton), who had since arrived at the Majik Market (but who had not seen Meeks exit the store), to stay with Thompson while they went for help. Hospital staff subsequently arrived at the Majik Market, but were unable to rescue Thompson; she died of the knife wounds inflicted upon her by Meeks.

Two weeks later, on November 6, 1974, Meeks and an accomplice, Homer Lee Hardwick, entered the Junior Food Store in Perry at between 8:00 p.m. and 8:30 p.m. Hardwick walked up to the front of the cash register and put his arm around the neck of Lloyd Walker, a sixteen-year-old boy who was in the store to make a purchase. While Hardwick immobilized Walker, Meeks approached the store clerk, Diane Allen, at gun point and demanded that Allen give him all the money in cash register. Allen complied and handed over between thirty and thirty-five dollars.

Meeks then instructed both Allen and Walker to walk to the back of the store and get in a storage closet. When they had done so, he told them to lie on their backs and then to roll over onto their stomachs. At that point, Meeks fired several shots, hitting Allen in the shoulder, and Walker in the head. After Meeks and Hardwick left the store, Allen waited a few minutes and then called the police. She was taken to a hospital and later recovered from her shoulder wound. Lloyd Walker died six days after the shooting.

B.

i.

---

Southerland testified that students at his high school got out for lunch at 11:07 a.m., and were expected to be back at the school by 11:45 a.m.

On November 19, 1974, Meeks and Hardwick were indicted by a Taylor County grand jury for the Walker killing. The indictment charged them with murder in the first degree, robbery, assault with intent to kill, and use of a firearm in the commission of a felony. The State sought the death penalty against both defendants.

Meeks and Hardwick were tried separately; Meeks went to trial first,[5] represented by John Howard, who was appointed by the court.[6] At Meeks' trial, Diane Allen testified as an eye-witness that it was Meeks, and not Hardwick, who did the shooting.[7] Although Allen did not actually see Meeks shoot Walker (because Meeks had instructed Allen to lie on her stomach while he killed Walker and attempted to kill her), she remembered that it was Meeks who had the gun when the pair entered the Junior Food Store, and that

[5]During oral argument before this panel, the State explained that the reason for indicting Meeks for the Walker killing, before indicting him for the earlier Thompson murder, was that the State had an eye-witness to the Walker killing (Diane Allen); there was no eye-witness to the Thompson murder.

[6]Howard practiced law not far from Perry in Cross City, Florida. The public defender in Perry had withdrawn from representing Meeks because his representation of Hardwick had created a conflict of interest, and so the trial judge appointed Howard as replacement counsel.

[7]Allen was able to identify Meeks as the shooter because, in addition to recalling his face generally, she particularly remembered his eyes. When asked during trial how long it took her to identify Meeks during a line-up, Allen responded:

> A: As soon as they turned around I knew which one it was.
>
> Q: How was that?
>
> A: Because I remembered him, I remembered his face.
>
> Q: Was there any specific about his face that you recall?
>
> A: His eyes.
>
> Q: The eyes you looked at?
>
> A: Yes.
>
> Q: Were they the same?
>
> A: Yes, sir.

Hardwick carried no weapon. Allen also testified that seconds before the shots were fired (immediately preceding the time when Meeks ordered both her and Walker to roll onto their stomachs in the back area storage room) Meeks still had the gun in his hand.

At the conclusion of the guilt phase of the trial, the jury found Meeks guilty on all counts. The jury then recommended the death penalty, and the court sentenced him to death.

ii.

On the same day the grand jury indicted Meeks and Hardwick for the Walker killing, it also indicted Meeks for the Thompson murder. Meeks' trial on that indictment took place two and a half months after he was convicted for the Walker killing.[8] Meeks was again represented by John Howard.

The three high school students who saw Meeks exiting the Majik Market and then discovered Thompson bleeding to death testified for the State. Although Southerland and McKee were unable to identify Meeks at a pretrial line-up, they indicated before the jury that Meeks was the person they saw exiting the Majik Market. McKee stated that the only reason he did not identify Meeks during the line-up was that there was a ".1%" chance that the person he saw at the Majik Market was not Meeks. Hingson, on the other hand, positively identified Meeks at the line-up as the person he saw in the Majik Market parking lot; he particularly remembered that Meeks resembled a college football player who used to play for the University of Florida.[9]

---

[8]The Walker trial took place on March 11-12, 1975. On April 14, 1975, two months before Meeks stood trial for the Thompson killing, Hardwick was tried and convicted separately for his participation in the Walker killing. Meeks testified for the State at Hardwick's trial. The parties have not provided a transcript, or a summary, of his testimony.

[9]On cross-examination, Hingson testified:

> Q: Okay, now you say you observed him for two to possibly three seconds and when you were asked to describe his general characteristics you said he was about five-eight?
>
> A: Yes sir.
>
> Q: What all, what other particular characteristics did you remember to help to identify him

**4**

The State also introduced into evidence two fingerprints that were left in the blood that had spattered on either side of the cash register. Jack Duncan, a Latent Fingerprint Examiner with the Florida Department of Criminal Law Enforcement, testified that Meeks' prints matched the ones found at the scene of the murder. Finally, Homer Hardwick testified that one week after the Thompson killing, Meeks told him that "he went into the store and he was trying to get something out of the store and the lady caught him and she picked the phone up to call the police and he grabbed her and killed her, cut her, started cutting her." Meeks was again convicted and sentenced to death.

## C.

In separate appeals, the Florida Supreme Court affirmed Meeks' convictions and death sentences in the two cases, *see Meeks v. State,* 336 So.2d 1142 (Fla.1976) ("*Thompson* "); *Meeks v. State,* 339 So.2d 186 (Fla.1976), ("*Walker* "). The United States Supreme Court denied Meeks' petition for a writ of certiorari in *Walker. Meeks v. Florida,* 439 U.S. 991, 99 S.Ct. 592, 58 L.Ed.2d 666 (1978). After the Supreme Court

---

when he was in the lineup?

A: He was fair skinned and I noticed when I came up there that I knew a football player that he kinda looked like, because whenever we drove up [into the Majik Market parking lot] I said he looks like so and so.

Q: Who is so and so?

A: Nat Moore, used to play for Florida.

Q: And you made that remark?

A: Yes sir.

Q: Any other positive identifying characteristics?

A: I noticed about the way his hair was braided. I was sure when I picked him out of the lineup. There is no doubt in my mind.

Q: Absolutely no doubt?

A: No sir.

decided *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), the Florida Supreme Court, acting on its own initiative, remanded Meeks' death sentence in both cases with an instruction that the trial court consider whether a *Gardner* error had occurred.[10] The trial court determined that no *Gardner* error had occurred in either case, and the Florida Supreme Court affirmed.

Meeks thereafter moved the trial court for post-conviction relief in both cases under Rule 3.850 of the Florida Rules of Criminal Procedure.[11] He argued,

> [With regard to *Walker,*] (1) that court-appointed counsel did not render effective assistance of counsel at trial, at the sentence hearing, or on appeal; (2) that the defendant's death sentence was imposed in violation of the sixth, eight and fourteenth amendments to the United States Constitution because it was imposed upon the recommendation of a jury that was not required to be unanimous; (3) that the jury was selected through procedures that systematically excluded from jury service persons having scruples against the death penalty in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (4) that defendant's death sentence violates the equal protection clause of the state and federal constitutions because it was imposed pursuant to a pattern and practice of racial discrimination in capital sentencing; (5) that there was no evidence of premeditation in the charge of murder and that, therefore, defendant could not be convicted of felony-murder and the underlying felony upon which the murder conviction was based; and (6) that defendant is entitled to a resentencing hearing on his first-degree murder conviction because statutory mandates were not followed and the prosecutor was allowed to make improper argument to the jury in contravention of due process of law. Except for ground 5, [Meeks] alleges the same grounds for relief with respect to his murder conviction in [*Thompson* ] and, in addition, alleges (6) that the defendant is entitled to a new trial because the prosecutor was allowed to make improper and inflammatory comments at closing argument; (7) that the sentencing judge's use of a court-ordered psychiatric examination violated defendant's rights under the fifth, sixth, eight and fourteenth amendments to the Constitution because defendant abandoned his insanity defense before trial; and (8) that defendant's death sentence is unconstitutional as applied under the eighth and fourteenth amendments to the Constitution because it is part of a wanton and freakish pattern of imposition in the State of Florida.

*Meeks v. State,* 382 So.2d 673, 675 (Fla.1980).

---

[10]*Gardner* held that the petitioner was denied due process of law when a death sentence was imposed, at least in part, on the basis of confidential information which was in a presentence report, but which was not disclosed to the petitioner or his counsel, so that petitioner had no opportunity to deny or explain the information.

[11]Stephen D. Stitt, of the Holand Law Center at the University of Florida, and June Rice, who practices law in Gainesville, Florida, filed Meeks' 3.850 motions. Jack Greenberg, James Nabrit, III, David Kendall, and Joel Berger, all of New York, New York, prosecuted his petition for a writ of certiorari in the United States Supreme Court. John Howard ceased representing Meeks at the conclusion of Meeks' direct appeals to the Supreme Court of Florida.

The trial court denied Rule 3.850 relief in both cases. The court did so without holding an evidentiary hearing, basing its denial on transcripts of the pretrial and trial proceedings. Meeks appealed the court's decisions, and the Florida Supreme Court found that "[a]ll except two of the ... issues were or could have been raised on direct appeal and therefore are foreclosed ... for collateral review." *Id.* The court, therefore, only addressed "the allegations of ineffective assistance of counsel [claim 1] and racial discrimination in capital sentencing [claim 4]." *Id.* The court rejected Meeks' racial discrimination challenge, *id.* at 676, but it also found that it could not "say that [Meeks'] specific allegations of ineffective assistance of counsel, considered collectively, conclusively show a lack of merit so as to obviate the need for an evidentiary hearing into the matter." *Id.* The court therefore stayed Meeks' scheduled execution, and remanded both cases to the trial court for an evidentiary hearing on the ineffective assistance claim.

On remand, the trial court held an evidentiary hearing in *Walker,* and denied Meeks Rule 3.850 relief. As far as we can determine from the record on appeal, the trial court did not hold an evidentiary hearing in *Thompson;* nor did it rule on the merits of Meeks' Rule 3.850 motion as it related to *Thompson.* In *Meeks v. State,* 418 So.2d 987 (Fla.1982), the Florida Supreme Court affirmed the denial of relief in *Walker.* In affirming the trial court, the supreme court rephrased Meeks' ineffective assistance of counsel claim as follows:

> (1) that counsel conducted inadequate jury voir dire and failed to seek and obtain additional peremptory challenges; (2) that counsel improperly allowed the prosecutor to present evidence relating to [Meeks'] codefendant and failed to properly pursue a strategy of establishing the codefendant's greater culpability; and (3) that [Meeks'] original trial counsel was unprepared for the sentencing phase of the proceeding.

*Id.* at 988. "With reference to the asserted criticisms of trial counsel's conduct at jury selection," the court observed that "methods of jury voir dire are subjective and individualistic.... The views of what constitutes the best tactical approach are divergent, and the manner of the examination varies from community to community." *Id.* The court therefore concluded, with regard to Meeks' first contention, that the "record does not establish any identifiable deficiencies in [Meeks'] trial counsel's voir dire examination; nor [did the court

**7**

find] his asserted failure to ask for additional peremptory challenges an erroneous omission by counsel necessitating a conclusion of ineffectiveness." *Id.* The court "reject[ed] the second contention that [Meeks'] trial counsel was deficient by allowing evidence of the codefendant's participation in the crime. It clearly appears that defense counsel attempted to make the codefendant the more dominant participant." *Id.* Finally, the court "reject[ed] the third assertion that defense counsel did not properly represent [Meeks] in the sentencing phase of these proceedings." *Id.* at 989.

Meeks then petitioned the United States District Court for the Northern District of Florida for a writ of habeas corpus. He made numerous claims,[12] but the district court only addressed two of them:

---

[12]Meeks' petition presented the following claims, which we state practically verbatim: (1) Petitioner was denied his constitutional right to the effective assistance of counsel at both the guilt/innocence and sentencing phases of his trials, in violation of the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States; (2) petitioner was denied his right to the effective assistance of counsel on appeal in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States in both cases; (3) jurors were excused in each trial for cause based on their conscientious scruples against death as punishment in violation of the constitutional standard of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and as a result petitioner was denied his right to a fair and impartial jury drawn from a cross-section of the community as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution; (4) the use by the trial judge of psychiatric reports in sentencing after petitioner's plea of not guilty by reason of insanity had been withdrawn, without warning to petitioner of his right to remain silent and the possible use of the information to sentence him to death, deprived petitioner of his right not to incriminate himself, to a fair trial and fundamental fairness in the use of evidence, to confrontation, to privacy and personal integrity, and to the equal protection of the law, guaranteed by the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution; (5) the prosecutor's closing argument at the guilt/innocence phase of *Walker* was improper and inflammatory, violating petitioner's right to a fair trial under the Sixth and Fourteenth Amendments to the Constitution of the United States; (6) petitioner was sentenced to death on the recommendation of juries with no requirement of unanimity, in violation of his right to a fair trial by jury and to be free from cruel and unusual punishment as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States; (7) the trial judge imposed the death sentence upon petitioner in each case immediately after the juries' recommendations and no doubt greatly influenced by the recommendations which were unconstitutionally tainted; (8) in [both cases] the instructions delivered by the trial judge to the sentencing jury limited consideration of mitigating circumstances to those enumerated in the death penalty statute, in violation of the Eight and Fourteenth Amendments; (9) in both cases the instructions to the jury in the penalty phase unconstitutionally shifted to Mr. Meeks the burden of proving that the mitigating circumstances outweighed the aggravating circumstances, in violation of his rights to due process of law and to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the Constitution; (10) the imposition of the death sentence on petitioner was the product of intentional racial discrimination in violation of petitioner's right to the equal protection of the law as guaranteed by the Fourteenth Amendment to the Constitution of the United States. That discrimination also constitutes a distinct violation of petitioner's right to be free from

**8**

> (1) [Meeks'] counsel rendered ineffective assistance of counsel during the guilt and sentencing phases of petitioner's trials, and (2) [Meeks] death sentences were the product of racial discrimination in violation of petitioner's right to equal protection as guaranteed by the Equal Protection Clause of the Fourteenth Amendment, and in violation of [Meeks'] right to be free from cruel and unusual punishment under the Eight and Fourteenth Amendments.

*Meeks v. Singletary,* 963 F.2d 316, 318 (11th Cir.1992).  The district court denied relief, and Meeks appealed.

In 1987, while his appeal was still pending, the United States Supreme Court rendered its decision in *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), holding that it was error for a trial court to instruct the jury to consider only statutorily enumerated mitigating circumstances and for the court to sentence a defendant to death if the trial judge only considered those same statutory mitigating circumstances.  Because in both *Walker* and *Thompson,* the court had limited the jury's consideration of mitigating evidence to statutorily enumerated factors, we granted Meeks leave to present his *Hitchcock* claim to the Florida Supreme Court.  In *Meeks v. Dugger,* 576 So.2d 713 (Fla.1991), that court found that "[a]t the penalty phase of both [the *Thompson* and *Walker* ] trials, the jurors were instructed to consider only those mitigating circumstances enumerated in [the Florida statute]." *Id.* at 714.  The court therefore remanded the case to the trial court to decide "whether the *Hitchcock* error was harmless.  In the event the court decides that the error was not harmless beyond a reasonable doubt, the sentences of death should be set aside and new sentencing proceedings conducted before separate juries." *Id.* at 716.

---

cruel and unusual punishment under the Eighth and Fourteenth Amendments; (11) in its review of petitioner's death sentences, the Florida Supreme Court considered evidence outside the record of petitioner's case and to which he had no access, in violation of his right to due process of law and to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States; (12) the Supreme Court of Florida's practice, unauthorized and unannounced by statute or rule, of requesting and receiving *ex parte* information concerning appellants in pending capital appeals, without notice to these appellants or their attorneys, denied death-sentenced appellants, including Mr. Meeks, due process of law, the effective assistance of counsel, and the right of confrontation, and subjected them to cruel and unusual punishment and to compulsory self-incrimination, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendment [sic].

The state trial court proceedings were held in abeyance pending our resolution of Meeks' appeal. In addressing his appeal, we noted that the district court had only addressed two of the grounds of relief alleged in Meeks' habeas petition. The district court had explained:

> Since the remaining grounds asserted in the petition for writ of habeas corpus have never formally been abandoned, the Court notes the following in support of its judgment that only the two issues named above remain. First, as early as December 6, 1983 counsel for petitioner stated in a letter to the court ... that only two issues remained to be resolved (one of which was effectiveness of counsel). Second, as recently as the status conference of June 6, 1985, only the two issues named above were argued by petitioner's counsel. Finally, the Florida Supreme Court was presented with almost all of the issues asserted in the instant petition. In *Meeks v. State,* 382 So.2d 673 (Fla.1980) that Court held that all of petitioner's claims *except* ineffective assistance of counsel and racial discrimination were barred by procedural default.

*Singletary,* 963 F.2d at 317. We construed the district court's statement as a finding "both that petitioner had abandoned the remaining claims, and that he was procedurally barred from raising any of them in federal court due to the Florida Supreme Court's finding of procedural default as to 'almost all' of them." *Id.* We affirmed the district court's dismissal of the racial discrimination claim, but remanded with instructions that the district court (1) hold an evidentiary hearing on Meeks' claims of ineffective assistance of counsel at trial and on appeal in both *Walker* and *Thompson, id.* at 319-20; and (2) "discern exactly which claims the Florida Supreme Court identified as procedurally defaulted [and][w]ith respect to these claims ... consider whether [Meeks] can demonstrate either cause and prejudice for his default, or a fundamental miscarriage of justice [under *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991) ]," *id.* at 321.

On August 26, 1997, the district court issued an order delineating the only issues that, according to the parties, were left in the case.[13] In its order, the court observed that "the State of Florida stipulated that Meeks would be provided with a new penalty phase in both cases." This rendered it unnecessary for the court to consider the penalty phase of either *Walker* or *Thompson.* The court described the issues framed by the

---

[13]On remand to the district court, Meeks' counsel were, and continue to be on appeal, Billy Nolas and Julie Naylor, both of whom practice law in Philadelphia, Pennsylvania.

parties for it to consider as follows:  (1) was Meeks' trial counsel ineffective for failing to secure a change in venue due to adverse pretrial publicity and racial animus in the community;  (2) was trial counsel ineffective for failing to object to the identification of Meeks in a line-up as overly suggestive;  and (3) was trial counsel ineffective for failing to object to the lack of an instruction on the lesser included offense of attempted robbery.

The court held an evidentiary hearing on these issues, and resolved them in favor of the State.  Meeks now appeals.[14]

## II.

Whether a criminal defendant has received the effective assistance of counsel is a mixed question of law and fact and is subject to *de novo* review.  The underlying factual findings of the district court are presumptively correct unless clearly erroneous.  *Bush v. Singletary,* 988 F.2d 1082, 1089 (11th Cir.1993).

## III.

To establish a case of ineffective assistance of counsel, a petitioner must satisfy a two-prong test:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

---

[14]We noted, *supra,* that in *Thompson* the state trial court apparently did not hold a hearing on Meeks' ineffective assistance claim, or enter an order ruling on its merits.  Hence, after remanding that claim to the trial court for an evidentiary hearing and decision, the Florida Supreme Court was never given an opportunity to rule on whether Meeks had been denied effective assistance of counsel in *Thompson.*  The State, in its response to Meeks' petition for habeas relief in *Thompson,* did not allege that Meeks' failure to obtain a dispositive ruling from the state courts constituted a procedural default.  We made passing reference to this fact in *Singletary,* 963 F.2d at 320 n. 5, when we noted that "the State, by failing to address the issue, has waived the defense that petitioner may not present to the district court any instances of alleged ineffectiveness not raised in state court."  In sum, for purposes of this appeal, we consider the state courts to have denied Meeks relief on his ineffective assistance claim in *Thompson.*

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). When reviewing an ineffective assistance claim in a capital case, we apply this two-prong test to the penalty phase as well as the guilt phase, because a

> capital sentencing proceeding ... is sufficiently like a trial in its adversarial format and in the existence of standards for decision ... that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision.

*Id.* at 686-87, 104 S.Ct. at 2064 (citations omitted). However, in the instant case we have no occasion to consider counsel's performance during the penalty phases of Meeks' trials, because the State has already stipulated that Meeks will be provided with a new penalty phase in both cases.

"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ..., that course should be followed." *Id.* at 697, 104 S.Ct. at 2069. In order to satisfy *Strickland's* prejudice prong, Meeks "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Meeks need not show, however, that his attorney's deficient performance "more likely than not altered the outcome in the case." *Id.* at 693, 104 S.Ct. at 2068.

> The "more likely than not" standard would be more demanding than what is required under *Strickland.* Rather, the correct inquiry turns on whether a "reasonable probability" exists in our minds that, had the lawyer not been constitutionally deficient in his representation, the outcome of the trial would have been different. In other words, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Stated yet another way, the proper inquiry under *Strickland* is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064.

*Mincey v. Head,* 206 F.3d 1106, 1143 (11th Cir.2000).

A.

Meeks' first contention is that his lawyer provided constitutionally ineffective assistance of counsel in failing to move the court for a change of venue because both the pretrial publicity surrounding *Walker* and

*Thompson,* and the pervasive racial animus in the community, either actually or presumptively prejudiced

both juries in his cases.

i.

The law on pretrial publicity as it relates to the necessity for a change of venue is clear.  The

standards governing this area

> derive from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth
> Amendment right to be tried by a panel of impartial, indifferent jurors.  The trial court may be unable
> to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community
> atmosphere.  In such a case, due process requires the trial court to grant defendant's motion for a
> change of venue....

*Coleman v. Kemp,* 778 F.2d 1487, 1489 (11th Cir.1985) (internal citations and quotation marks omitted).[15]

This does not mean, however, that a defendant is entitled to a change of venue whenever potential jurors have

been exposed to the facts of the case.

> It is not required ... that jurors be totally ignorant of the facts and issues involved.  In these days of
> swift, widespread and diverse methods of communication, an important case can be expected to
> arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as
> jurors will not have formed some impression or opinion as to the merits of the case.  This is
> particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to
> the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a
> prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the
> juror can lay aside his impression or opinion and render a verdict based on the evidence presented
> in court.

*Irvin v. Dowd,* 366 U.S. 717, 722-23, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961).

A defendant is entitled to a change of venue if he can demonstrate either "actual prejudice" or

"presumed prejudice."

> To find the existence of actual prejudice, two basic prerequisites must be satisfied.  First, it must be
> shown that one or more jurors who decided the case entertained an opinion, before hearing the
> evidence adduced at trial, that the defendant was guilty.  Second, these jurors, it must be determined,
> could not have laid aside these preformed opinions and rendered a verdict based on the evidence
> presented in court.

---

[15]Alternatively, a court might consider granting a motion for continuance.

**13**

*Coleman v. Zant,* 708 F.2d 541, 544 (11th Cir.1983) (internal citations and quotation marks omitted). If a defendant cannot show actual prejudice, then he must meet the demanding presumed prejudice standard.

> Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held. The presumed prejudice principle is rarely applicable, and is reserved for an extreme situation.... [W]here a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually impossible a fair trial by an impartial jury drawn from the community, jury prejudice is presumed and there is no further duty to establish bias.

*Kemp,* 778 F.2d at 1490 (internal citations and quotation marks omitted); *see also Manning v. State,* 378 So.2d 274, 276 (Fla.1979) ("[A] determination must be made as to whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom.").

ii.

In order to satisfy the prejudice prong of *Strickland's* ineffective assistance analysis, Meeks must establish that there is a reasonable probability that, but for his counsel's failure to move the court for a change of venue, the result of the proceeding would have been different. This requires, at a minimum, that Meeks bring forth evidence demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted a motion for change of venue if Meeks' counsel had presented such a motion to the court. Meeks has failed to carry this evidentiary burden.

The district court did not find, and Meeks does not seriously argue, that he has demonstrated any actual prejudice on the part of either of the juries that convicted him.

> [Meeks] has not shown that even one juror, prior to hearing the evidence, had formed an opinion that he was guilty. Even if [Meeks] had presented evidence indicating that a juror had formed such an opinion, he still would have had to show that the juror could not have rendered a verdict based on the evidence presented.

*Mills v. Singletary,* 63 F.3d 999, 1009 (11th Cir.1995); *see also United States v. Lehder-Rivas,* 955 F.2d 1510, 1525 (11th Cir.1992). The fact that all except one of the jurors in both of Meeks' cases had been

**14**

exposed to some pretrial publicity concerning the Walker and Thompson murders[16] is unavailing because, as we discuss in more detail *infra,* "the pretrial publicity in this case was essentially factual and was not so pervasive or insidious as to raise the presumption that any venireperson exposed to it was rendered incapable of giving [Meeks] a fair trial." *Mills* at 1009 n. 15; *see also Cummings v. Dugger,* 862 F.2d 1504, 1510-11 (11th Cir.1989) (finding no actual prejudice even though eleven of twelve jurors had been exposed to some degree of pretrial publicity).

Meeks' principle argument is that the pretrial publicity in his cases was so intense that the trial court would have found, had his counsel brought the publicity to the court's attention, that he met the presumed prejudice standard, and therefore would have granted a motion for change of venue. Meeks' evidence of pretrial publicity primarily consists of four newspaper articles reporting on the facts of the Walker and Thompson murders. Because the articles are brief, we set them out in their entirety:

On November 7, 1974, an unidentified newspaper printed the following article, under the headline "Two Suffer Wounds in Perry Holdup":

> A Jr. Food Store clerk was shot in the shoulder and a customer in the neck here Wednesday in Perry's second armed robbery in two weeks.
>
> Diane Allen, 18, [illegible word] at the convenience store off Old Dixie Highway here, was waiting on Lloyd Walker, a Perry youth, when two men entered the store about 8:15 p.m.
>
> Sheriff Maurice [illegible word] said both the girl and boy were shot. The robbers cleaned out the cash register and fled.
>
> Both youths were rushed to Doctors Memorial hospital in Perry, then the more seriously injured Walker was transferred to Tallahassee Memorial Hospital where his condition is described as critical.

On November 13, 1974, the *Tallahassee Democrat* printed the following article, under the headline "Two Charged With Murder Of Perry Boy":

---

[16]Jurors uniformly stated that all of their information concerning the Walker and Thompson murders was gleaned from newspaper articles (discussed *infra* ), or from "street talk."

**15**

Two Perry men have been charged with murder after a 16-year-old boy shot in an armed robbery last week died Tuesday.

The case will be presented to the Taylor County Grand Jury later this week.

The two charged are Homer Lee Hardwick, Jr., 18, and Douglas Ray Meek [sic], 21. Hardwick was arrested Friday and Meek [sic] Tuesday.

The dead boy, Lloyd Walker, was shot three times during the robbery of a Perry convenience store last Wednesday. He died at Tallahassee Memorial Hospital.

Investigator Buddy Murphys said the two men allegedly entered the store around 8:30 p.m., demanded money from the clerk, Diane Allen, then forced Miss Allen and the Walker youth into the storeroom where they were told to lie on the floor.

Miss Allen was shot twice.

Hardwick and Meek [sic] also have been charged with armed robbery. Investigators said about $32 was taken in the robbery.

The investigation was conducted with the assistance of the Florida Department of Criminal Law Enforcement.

On November 20, 1974, an unidentified newspaper printed the following article, under the headline

"Indictments Issued In Perry Murders":

The Taylor Count Grand Jury Tuesday indicted two men on charges of robbery and murder at convenience stores here.

Douglas Ray Meeks, formerly of Mississippi, was indicted on two counts of murder. One is for the death of Lloyd Walker, 16, who died of gunshot wounds received during a robbery at a store on Nov. 6. The second charge is for the fatal stabbing of Mrs. Chevis Thompson on Oct. 25 at the Majik Market in Perry.

Charged with Meeks in the Walker murder is 18-year-old Homer Lee Hardwick, Jr. of Perry.

Both were also indicted and charged with robbery, assault with intent to murder and possessing of firearms during the commission of a felony.

Arraignment and trial dates are expected to be set shortly.[17]

---

[17]Included in the record is another article from an unidentified newspaper that appears to be an exact reprint of this article.

On November 24, 1974, the *Tallahassee Democrat* printed an article under the headline "Perry Bitter Over Slaying," most of which concerned an unrelated murder of a Florida State Trooper. However, the following language about the Walker and Thompson killings was included in the story:

The rest of Florida may have only a passing interest in Trooper Cambell's funeral today, but not Perry where there have been two local robbery killings in the last three weeks.

"With no death penalty, early parole and free lawyers, the criminals find it safer to kill the witnesses," said [Officer] Young.

He said that was "surely the motive" in the execution of Lloyd Walker, 16, in a Jr. Food Store hold up in Perry Nov. 6. Walker and the store attendant, Diane Allen, 19, were shot after they were told to lie down in a backroom at the store. He died from three wounds. She survived two shots.

Mrs. Chevis Thompson, 54, was stabbed to death in a holdup at Majik Market here Oct. 24 for what Young believes was the same motive.

"They have nothing to lose," he said. "It's getting as bad as it was around here 100 years ago when there was no law."

Taylor County is former Gov. Claude Kirk country. He is the only Florida governor in recent years willing to sign the death penalty.

This, along with some identical affidavits stating that the murders were a topic of public conversation,[18] is the sum total of the evidence of pretrial publicity that Meeks presented to the district court.[19]

---

[18]Meeks presented eight identical affidavits from Perry residents stating that "in rural Taylor County the offenses ... were a topic of conversation for weeks." These affidavits were originally filed in *Hardwick's* trial, in his motion for change of venue. Hardwick's motion was denied. Additionally, Meeks presented an affidavit from Margaret Carey, a sociologist who visited Perry on January 11, 1980. Carey stated that "[e]veryone approached knew about the murders and agreed they were a topic of considerable conversation within the community at the time of the trials."

[19]Meeks also submitted a great deal of evidence that, even under the totality of circumstances, cannot be considered highly relevant. He presented five newspaper articles written in 1974 about the killings of a Florida Highway Patrolman and another man by Paul John Knowles. He also presented one article about an investigation of the Taylor County Sheriff's Office by the Florida Department of Criminal Law Enforcement for "political abuses," one article about three African-American men being questioned in connection with a fire bomb found in the yard of a Perry residence, one article about a resolution passed in 1974 by the Board of Directors of the Florida Sheriff's Association, which called for "drastic reforms in the parole and prison systems of Florida," and one article bemoaning the "rash of thefts and vandalism" in Taylor County schools. Finally, Meeks submitted one article from the *Perry News-Herald,* dated September 18, 1980, entitled "Meeks' Hearing Goes On." The article concerned the post-conviction efforts of Meeks' counsel to obtain relief for him based on his claim of constitutionally ineffective assistance of counsel. This last article is the

It is not even close to the sort of evidentiary showing that is necessary to establish presumed prejudice. What immediately leaps out to anyone who examines Meeks' evidentiary proffer is not its "perva[sive]" and "inflammatory" character, *Kemp,* 778 F.2d at 1490, but instead its meagerness and tendency towards the mundane. The four articles are almost entirely factual, with no comment on Meeks' potential culpability for the crimes, no horrible description of the details of the killings, and no information on any past criminal activities in which Meeks may have been involved. *See United States v. De La Vega,* 913 F.2d 861, 865 (11th Cir.1990); *Kemp,* 778 F.2d at 1538-39. The only statement that is remotely inflammatory is Officer Young's comment in the November 24 issue of the *Tallahassee Democrat* that "[w]ith no death penalty, early parole and free lawyers, the criminals find it safer to kill the witnesses," and that this was "surely the motive" in the Walker killing. Nowhere in that article, however, is Meeks' name even mentioned.

One can compare the instant case to those cases in which courts have found that a petitioner has satisfied the burden of demonstrating presumed prejudice. In *Irvin v. Dowd,* for example, the Supreme Court described the pretrial publicity that had attended the petitioner's murder trial in the following manner:

> [T]he build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing. For example, petitioner's first motion for a change of venue from Gibson County alleged that the awaited trial of petitioner had become the *cause celebre* of this small community—so much so that curbstone opinions, not only as to petitioner's guilt but even as to what punishment he should receive, were solicited and recorded on the public streets by a roving reporter, and later were broadcast over the local stations. A reading of the 46 exhibits which petitioner attached to his motion indicates that a barrage of newspaper headlines, articles, cartoons and pictures was unleashed against him during the six or seven months preceding his trial. The motion further alleged that the newspapers in which the stories appeared were delivered regularly to approximately 95% of the dwellings in Gibson County and that, in addition, the Evansville radio and TV stations, which likewise blanketed the county, also carried extensive newscasts covering the same incidents. These stories revealed the details of his background, including a reference to crimes committed when a juvenile, his convictions for arson almost 20 years previously, for burglary and by a court-martial on AWOL charges during the war. He was accused of being a parole violator. The headlines announced his police line-up identification, that he faced a lie detector test, had been placed at the scene of the crime and that the six murders were solved but petitioner refused to confess. Finally, they announced his confession to the six

---

only submission that might have any evidentiary value, since it is the only article that is in any way linked to Meeks; unfortunately for Meeks, the article was written five years after his trials took place, and so it could not possibly have prejudiced the jury in either of his cases.

murders and the fact of his indictment for four of them in Indiana. They reported petitioner's offer to plead guilty if promised a 99-year sentence, but also the determination, on the other hand, of the prosecutor to secure the death penalty, and that petitioner had confessed to 24 burglaries (the *modus operandi* of these robberies was compared to that of the murders and the similarity noted). One story dramatically relayed the promise of a sheriff to devote his life to securing petitioner's execution by the State of Kentucky, where petitioner is alleged to have committed one of the six murders, if Indiana failed to do so. Another characterized petitioner as remorseless and without conscience but also as having been found sane by a court-appointed panel of doctors. In many of the stories petitioner was described as the "confessed slayer of six," a parole violator and fraudulent-check artist. Petitioner's court-appointed counsel was quoted as having received "much criticism over being Irvin's counsel" and it was pointed out, by way of excusing the attorney, that he would be subject to disbarment should he refuse to represent Irvin. On the day before the trial the newspapers carried the story that Irvin had orally admitted to the murder of Kerr (the victim in this case) as well as "the robbery-murder of Mrs. Mary Holland; the murder of Mrs. Wilhelmina Sailer in Posey County, and the slaughter of three members of the Duncan family in Henderson County, Ky."

It cannot be gainsaid that the force of this continued adverse publicity caused a sustained excitement and fostered a strong prejudice among the people of Gibson County. In fact, on the second day devoted to the selection of the jury, the newspapers reported that "strong feelings, often bitter and angry, rumbled to the surface," and that "the extent to which the multiple murders—three in one family—have aroused feelings throughout the area was emphasized Friday when 27 of the 35 prospective jurors questioned were excused for holding biased pretrial opinions...." A few days later the feeling was described as "a pattern of deep and bitter prejudice against the former pipe-fitter." Spectator comments, as printed by newspapers, were "my mind is made up"; "I think he is guilty"; and "he should be hanged."

Finally, and with remarkable understatement, the headlines reported that "impartial jurors are hard to find." The panel consisted of 430 persons. The court itself excused 268 of those on challenges for cause as having fixed opinions as to the guilt of petitioner.... An examination of the 2,783-page *voir dire* record shows that 370 prospective jurors or almost 90% of those examined on the point (10 members of the panel were never asked whether or not they had an opinion) entertained some opinion as to guilt-ranging in intensity from mere suspicion to absolute certainty. A number admitted that, if they were in the accused's place in the dock and he in theirs on the jury with their opinions, they would not want him on a jury.

366 U.S. at 725-27, 81 S.Ct. at 1644-45. Even with all this evidence, the Supreme Court actually based its decision to vacate the petitioner's conviction on a finding of *actual* prejudice (because eight of the twelve jurors who had convicted him thought the petitioner was guilty before any evidence had been presented). *See id.* at 727-28, 81 S.Ct. at 1645.

Other cases are similarly revealing. In *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), the Supreme Court found presumed prejudice where the petitioner's twenty-minute videotaped confession to the robbery, kidnaping, and murder at issue in the case was broadcast three times to tens of

**19**

thousands of people (in a community of only 150,000). And in *Kemp,* 778 F.2d 1487, this court found presumed prejudice where the petitioner presented the court with over 150 newspaper articles written about his case before or during his trial (one of which included a statement by the county's chief law enforcement officer that he would like to "precook" the petitioner before he was electrocuted), media broadcast transcripts, and witness statements indicating that the case was a main topic of conversation for an extended period of time. *See also Manning,* 378 So.2d at 275 (finding presumed prejudice where "[t]he sheriff's department and state attorney's office released to the press their versions of the facts and circumstances in the shooting incident ... [,] the prosecutor released to the press the names of the primary witnesses to the crime[,][t]he prosecutor told the local newspaper the substance of the initial testimony given to the state attorney's office by this alleged eye-witnesses ... [, and] the sheriff discussed evidence gathered during the investigation, including in his statements conclusions [sic] implying a total lack of justification on behalf of the appellant in the shootings.")

When one compares these precedents to the cases at hand, it becomes obvious that Meeks has not carried his burden of demonstrating presumed prejudice. *See Mills,* 63 F.3d at 1010-11 (fifteen newspaper articles and testimony that petitioner's involvement in the murder was a public topic of conversation not sufficient to establish presumed prejudice); *De La Vega,* 913 F.2d at 865 (330 newspaper articles not sufficient to establish presumed prejudice because they were "largely factual in nature and could not have created the sort of inflamed community atmosphere which courts deem presumptively prejudicial"). Further, "[o]ur conclusions regarding the publicity are borne out in the voir dire." *Mills,* 63 F.3d at 1012. No jurors in either *Walker* or *Thompson* were dismissed on account of bias against Meeks. In the *Walker* voir dire, two jurors were dismissed because they were opposed to capital punishment such that they could not convict Meeks if they knew that it was possible that he might receive the death penalty during the guilt phase; one was dismissed because he was familiar with Hardwick, and so would have been uncomfortable sitting in judgment of Meeks; one because he was biased *in favor* of Meeks; and one because he knew Lloyd Walker.

**20**

In the *Thompson* voir dire, four jurors were dismissed because they were opposed to capital punishment such that they could not convict Meeks if they knew that it was possible that he might receive the death penalty during the guilt phase; two were dismissed because of family circumstances or financial burden; two because they were biased *in favor* of Meeks; and one because he knew Chevis Thompson.

Meeks argues that even if the evidence of pretrial publicity, alone, is insufficient, there was a pervasive racial bias against African-Americans in the community that combined with the pretrial publicity to either actually or presumptively prejudice the juries in his cases. As an initial matter, we question whether Meeks has established that there was a pervasive racial bias in Perry, Florida during the time that he was tried and convicted of the Walker and Thompson murders. Meeks presented the district court with several affidavits opining that Perry was a racially divided community in the mid-1970s,[20] some newspaper articles about a racial incident that occurred at the town's high school, and about Klan activity in the area,[21] and trial

[20]Meeks presented the following affidavits: David Lipman, an attorney who specializes in lawsuits against municipalities for racial discrimination in the provision of municipal services, stated that "it is my professional belief that the City of Perry, Florida has perpetrated racial discrimination historically and presently against black residents of Perry, Florida;" Margaret Carey, an African-American sociologist who visited Perry on January 11, 1980, detailed her personal experiences of racial discrimination when she tried to patronize various bars and lounges in Perry and was told either to sit in the back of the establishment, or that the establishment was no longer serving that day; Lawrence Noble, Jr., an Associate Professor of Political Science, stated that he had examined newspapers from Taylor County from 1974, and had concluded that there was racial tension in Perry, and that "[j]ury pools ordinarily in such a community are typically skewed toward older white men, with fewer women, still fewer black persons, hardly any young people of either sex or race, and virtually no persons from the lowest socio-economic stratum;" and eight Perry residents stated, in identical affidavits filed in the Hardwick case in conjunction with his motion for change of venue (which was denied), that "[t]here is a strong undercurrent of racial unrest in Taylor County, Florida as evidenced by the near riot conditions of the recent past. Under the circumstances of this case, the racial friction in Taylor County would bar Homer Lee Hardwick from receiving a fair and impartial trial." Additionally, during the evidentiary hearing in the district court, Theodore Marshall, a Perry resident, testified that in 1975 there was racial tension in Perry such that he did not "think that the people there would let [Meeks] have a fair trial." Finally, Thomas Wright, of the NAACP, testified that in the mid-1970s, "Perry was right at the bottom in the state ... in terms of race relations."

[21]Meeks presented one newspaper article and one editorial from the October 3, 1974 issue of the *Perry News-Herald* concerning a school shut-down that apparently lasted only one day, following some racially motivated fighting among the students. There is also a December 12, 1978 article from the *Tallahassee Democrat* about a planned visit to Perry by David Duke, the then Grand Dragon of the Klu Klux Klan. Another Klan-related article from April 10, 1977 is entitled "Men in white no longer possess political clout."

transcripts indicating that two witnesses in *Walker* and one witness in *Thompson* used racially inappropriate terms to identify Meeks.[22] The district court found this evidence to be "too thin a reed to support a claim of pervasive racial animus."

However, even if Meeks has established that racism existed in Perry, Florida at the time he was convicted, his claim of prejudice must still fail because he has entirely neglected to show that racial bias played any part in his convictions in either of *his specific cases. Cf. McCleskey v. Kemp,* 481 U.S. 279, 292-93, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987) (holding that to establish that petitioner's death sentence was rendered in violation of the Equal Protection Clause, petitioner "must prove that the decisionmakers in *his* case acted with discriminatory purpose;" claim failed because petitioner "offer[ed] no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence").

---

The piece is about several men who joined the Klan, and it explores their reasons for doing so. The article reports that

> Klansmen say their two major tenets are patriotism and Christianity. "And if you read certain passages of the Bible," [one of the men being studied said,] "you can see where God mentions 'beasts of the field.' "
>
> ....
>
> [One man] was a U.S. Coast Guardsman three years and says duty took him to Philadelphia, Pa., where he saw the evils of the big city. "Before I even got out of the bus station at Philadelphia, I was approached by a prostitute and someone tried to sell me dope," [he] remembers. "I came back to Perry and found out that kind of thing was going on here too. When the man (a Klan organizer from Port St. Joe) approached me with literature, I knew what my answer was right then."

As one might guess from reading these quoted excerpts, the April 10 article exposes the dissipation of Klan power in Florida, and does not support the contention that the Klan remained a major political or social force during the mid- to late-1970s.

[22]At the *Walker* trial, Ray Burnett and Sammy Tomlinson testified that they had seen two African-American men walking outside the Junior Food Store at around 8:00 p.m. Burnett testified that he had "passed two black boys. They usually don't come in that section," and Tomlinson testified that he had "never seen colored boys in that neighborhood. That's what attracted my attention."

At the *Thompson* trial, James Southerland testified that the man he saw exit the Majik Market convenience store was "colored."

There is no evidence that any of the jurors in either the *Walker* or *Thompson* trials entertained notions that Meeks should be convicted because he is African-American. There is no allegation that the prosecutor exercised peremptory challenges on the basis of race in violation of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965);[23] that African-Americans were excluded from either the grand or petit juries, *see Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986);[24] or that the prosecutor made racially biased prosecutorial arguments, *see Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).[25] Meeks has presented us with no newspaper accounts of the murders that even identified him as an African-American. In short, there is no evidence connecting any general racial bias in the community to any alleged error in either of Meeks' trials.

Because we find that Meeks has failed to bring forth evidence of pretrial publicity and racial bias sufficient to establish either actual or presumed prejudice, we hold that there is no reasonable probability that the trial court would have granted a motion for change of venue, even if Meeks' counsel had presented such a motion to the court. Therefore, because Meeks has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, Meeks has failed to satisfy the prejudice prong of *Strickland's* ineffective assistance analysis on this claim.

B.

On January 21, 1974 Meeks participated in a line-up for both the Walker and Thompson investigations. In the *Walker* case, he was positively identified by Diane Allen. In the *Thompson* case, he

---

[23]The evidentiary showing announced in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), would not apply in Meeks' case, because *Batson* does not apply retroactively. *See Allen v. Hardy,* 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

[24]In fact, the record indicates that one of the jurors who voted to convict Meeks was African-American.

[25]Also, Meeks was not entitled to a change of venue merely because he is African-American and his victims were white. *Cf. Ristaino v. Ross,* 424 U.S. 589, 96 S.Ct. 1017, 47 L.Ed.2d 258 (1976).

**23**

was positively identified by Thomas Hingson. Meeks argues that the line-up was "devastatingly suggestive and unconstitutional," and that his lawyer provided constitutionally ineffective assistance of counsel when he failed to object to the line-up at trial.

The source of this "devastating[ ] suggestive[ness]" is that Meeks was the only person in the line-up wearing both a yellow shirt and yellow pants, and having no shoes. We fail to see how this is suggestive at all, and are completely at a loss to understand how it could be "devastatingly suggestive."

Of the other five people in the line-up, one was a 22-year-old African-American male, five feet nine inches tall, weighing 187 pounds, and wearing no coat, a yellow shirt, brown pants, and black and white shoes; one was a 19-year-old African-American male, five feet eight inches tall, weighing 170 pounds, and wearing no coat, a blue and white shirt, blue pants, and black shoes; one was a 21-year-old African-American male, five feet ten inches tall, weighing 152 pounds, and wearing no coat, a brown and white shirt, blue pants, and black shoes; one was a 20-year-old African-American male, five feet ten inches tall, weighing 120 pounds, and wearing no coat, a blue shirt, blue pants, and brown shoes; and one was a 22-year-old African-American male, five feet eleven inches tall, weighing 175 pounds, and wearing a blue coat, a green shirt, green pants, and black shoes. Meeks was a 21-year-old African-American male, five feet eleven inches tall, weighing 160 pounds, and wearing no coat, a yellow shirt, yellow pants, and no shoes.

There is no reasonable argument that Meeks was positively identified by Allen and Hingson for any reason other than the fact that they saw Meeks at the scene of his murders. Any motion to suppress the identifications on grounds of suggestiveness would have been denied. For this reason, we agree with the district court that "because counsel has no duty to bring forth non-meritorious motions, Meeks cannot meet either prong of the *Strickland* test based on the line-up."

C.

Finally, Meeks contends that he was convicted in the Thompson case under a theory of felony-murder during the course of an attempted robbery. He claims, however, that the judge failed to give a specific

**24**

instruction concerning attempted robbery, and that he was provided with constitutionally ineffective assistance of counsel since his attorney did not object to such omission.

The instructions given to the jury in the Thompson case included the following:

[The prosecution has proven that the defendant committed robbery if the prosecution has proven first] that the Defendant did take from the person or immediate custody of such person some money or property and two, that the property was taken against the will of Chevis Thompson and was taken by means of force, violence or assault or by putting Chevis Thompson in fear and three, the taking was with the intent to permanently deprive the owner of the use of the property taken. The property taken must be of some value, but the extent of value makes no difference in determining guilt of the crime of robbery. The taking must be by the use of force or violence or by assault so as to overcome the resistance of the victim or by putting the victim in fear so that he or she does not resist. The law does not require that the victim of robbery resist to any particular extent or that he or she offer any actual physical resistance, if the circumstances are such that he or she is placed in fear of death or great bodily harm if they do not resist, but unless prevented by fear, there must be some resistance to make the taking one done by force or violence. In order for a taking by force, violence or putting in fear to be robbery it is not necessary that the taking be from the person of the victim. It is sufficient if the property taken be in the presence of and under the immediate and actual control of the victim so that it cannot be taken without the use of force, violence or intimidation directed against the victim. In order for a taking of property by force, violence or putting in fear to be robbery, it is not necessary that the person robbed be the actual owner of the property. It is sufficient if he or she has the custody of the property at the time of the offense.

....

The Court will now define for you the definition of an attempt to commit a crime. It is a crime for any person to attempt to commit an offense prohibited by law and in such attempt do any act toward the commission of such offense. The charge of murder in the first degree includes a charge of the lesser offense of an attempt to commit that crime. An attempt to commit a crime consists of the formation of an intention to commit that particular crime at the particular time and place and the doing of some physical act toward and which was intended to accomplish the commission of the crime. The act done must be more than mere preparation to commit the crime. It must be one intended to actually do the wrong which constitutes the crime. The purpose of the two felony-murder statutes is to make a distinction between principals in the first or second degree on the one hand and accessories before the fact on the other hand in determining whether a party to a felony resulting in murder is guilty of murder in the first degree or guilty of murder in the second degree. If a person is a participant in a robbery as either a principal in the first or second degree and murder is committed during the perpetration or attempt to perpetrate that robbery, then he is guilty of murder in the first degree.

We agree with the district court that when one examines the instructions as a whole, one cannot help but conclude that "the jury was adequately instructed concerning attempted robbery." The district court explained,

**25**

[f]irst, the judge gave a full description of the elements of the crime of robbery, taking up over a page of transcript. Then, just a few moments later, the judge defined attempt, taking up over a page of transcript. In determining whether a state jury charge was deficient, federal habeas courts are required to examine the instruction in light of all the instructions and indeed all of the trial, to determine if any prejudice occurred from the instruction as given. *Goodwin v. Balkcom,* 684 F.2d 794, 800 (11th Cir.1982), *cert. denied,* 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); *James v. Borg,* 24 F.3d 20, 27 (9th Cir.1994). In the instant case, there is simply no evidence to support the conclusion that the jury misunderstood the elements of the crime of attempted robbery. The jury received in-depth, complete instruction concerning the elements of robbery and the elements of attempt, and it is not too difficult a task to apply attempt to robbery. Accordingly, any objection to the failure to specifically phrase the instruction in the format of attempted robbery would have been frivolous and would not have had any affect on the outcome at trial. As such, any error on the part of counsel in refusing to demand such an instruction was harmless.

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court, denying Meeks' petition for a writ of habeas corpus.

SO ORDERED.