PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 03, 2001
THOMAS K. KAHN
CLERK

_____

No. 00-15572

_____

D.C. Docket No. 94-C-2343-S

MICHAEL EUGENE THOMPSON,

Petitioner-Appellant,

versus

MICHAEL W. HALEY, Commissioner
of the Alabama Department of Corrections,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(July 3, 2001)**

Before DUBINA, BARKETT and MARCUS, Circuit Judges.

BARKETT, Circuit Judge:

Michael Eugene Thompson appeals from the district court's denial of his

petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 following his

conviction for capital murder and the imposition of the death penalty. On appeal, Thompson seeks reversal of the district court's denial of federal habeas relief based on two claims:

(1) His conviction and sentence were based upon a confession which was unlawfully obtained and admitted at trial in violation of his Fifth and Fourteenth Amendment rights.

(2) He was deprived of his Sixth Amendment right to effective assistance of counsel at both the guilt and penalty phases of trial.

## BACKGROUND

On the night of December 10, 1984, Thompson robbed the Majik Mart in Attalla, Alabama. Maisie Gray was the only person working at the store that night. Thompson, carrying a .22 caliber pistol, forced Gray to empty the cash register and then forced her into his car and left the area. After driving around for some time, Thompson took Gray to a well and forced her into it, thereafter shooting into the well several times. Thompson then drove to the home of Shirley Franklin with whom he was living. He told Shirley Franklin what had happened, picked up some more bullets and returned to the well with Franklin. While Franklin held a homemade torch, Thompson shot into the well seven or eight more times. The next day Thompson took the pistol, which he and Shirley had cleaned, and threw it into another well.

On January 5, 1985, law enforcement authorities received a call from Gary Franklin, Shirley Franklin's husband, reporting that he knew where the victim of the Majik Mart robbery was and who had taken her. When the officers arrived at Gary Franklin's home, Shirley Franklin told the officers that Thompson had killed Gray and where the victim's body was located. The police found the body at the well, obtained a statement from Shirley Franklin, and arrested Thompson the same day.

At the time of arrest, Thompson refused to sign a waiver of his Miranda rights. However, on the following day, after a visit from Shirley Franklin, he signed a waiver of his rights and gave a taped confession in which he admitted to the robbery, kidnaping and murder. Two days later, Thompson was re-interrogated and again admitted his guilt and gave a similar account of the crime.

After a jury trial, Thompson was convicted of capital murder in violation of Section 13A-5-40(a)(1) and (2) of the Code of Alabama (1975), and the jury recommended the death penalty. Following a separate sentencing hearing, the trial judge followed the jury's recommendation and sentenced Thompson to death. The Alabama Criminal Court of Appeals and the Alabama Supreme Court affirmed. Thompson v. State, 503 So. 2d 871 (Ala. Crim. App.1986); Ex parte Thompson, 503 So. 2d 887 (Ala.1987).

Thompson filed a petition for post-conviction relief in state court and after a full evidentiary hearing pursuant to Rule 20 of the Alabama Rules of Criminal Procedure, the state trial court denied relief and the Alabama Court of Criminal Appeals affirmed. Thompson v. State, 581 So. 2d 1216 ( Ala. Crim. App. 1991).

Thompson next filed for federal habeas. The district court held an evidentiary hearing on his involuntary confession claim and made oral factual findings, but it later ruled that the evidentiary hearing was improperly granted and that it erred in making its findings of fact and denied relief on all claims. Thompson appeals.

**Standard of Review**

Thompson's habeas corpus petition was filed before April 24, 1996; therefore, the Antiterrorism and Effective Death Penalty Act (AEDPA) does not govern our analysis.[1] Under pre-AEDPA standards, the state court's factual determinations that are reasonably based on the record are presumptively correct. 28 U.S.C. § 2254(d). We review state court determinations of law de novo. Freund v. Butterworth, 165 F.3d 839, 861 (11th Cir. 1991). We review the district court's findings of fact under the clearly erroneous standard and the district court's

---

[1] Although the district correct erroneously applied the AEDPA standards, this error does not affect our analysis of Thompson's claims.

4

legal conclusions <u>de novo</u>.   <u>Remeta v. Singletary</u>, 85 F.3d 513, 516 (1996).

## Discussion

**I.  Whether Thompson's confession was admitted in violation of his Fifth and Fourteenth Amendment rights.**

We first address Thompson's argument that he is entitled to a federal evidentiary hearing on the claim that his confessions were unlawfully obtained and admitted at trial in violation of his Fifth and Fourteenth Amendment rights. Specifically, Thompson asserts that his confession was coerced by state law enforcement's false representation that Shirley Franklin would be left to bear the responsibility for the crime alone and face the electric chair if Thompson did not confess.

According to Thompson's testimony at the Jackson-Denno hearing[2] on his motion to suppress the confession, he was interrogated by Detective A.G. Lang on the day he was arrested for approximately one hour.  Lang told Thompson that he could place Shirley Franklin at the well, that Franklin was in a cell downstairs in the jail, and that she would be tried and sentenced to the electric chair along with him, but that he would let her go if Thompson made a statement.  Thompson then asked to talk with Franklin, and Franklin was immediately brought in, in

---

[2]  <u>Jackson v. Denno</u>, 378 U.S. 368 (1964) (trial judge must determine, at a separate hearing, that a confession is voluntary before it may be heard by a jury.)

handcuffs, to speak with Thompson. Thompson told her that he was going to confess because Lang had promised to release her if he did so. Franklin responded that she loved him. After meeting with Franklin, Thompson told Lang that he was ready to confess. Lang then notified Sheriff McDowell. When McDowell arrived, he gave Thompson a waiver of rights form, which Thompson signed, and then proceeded to take his tape-recorded confession.

In rebuttal, the state called Sheriff McDowell. McDowell testifed that, before Thompson gave his confession, Thompson had asked to speak with both Lang and Franklin. After he had spoken with Lang and Franklin, and after McDowell had informed Thompson of his Miranda rights, Thompson gave his confession. McDowell stated that at no time in his presence were any promises, threats, or coercion made to Thompson, and that no one told Thompson that Franklin would be prosecuted for capital murder unless Thompson confessed.

On appeal, Thompson argues that because the state court misapplied governing law and failed to make any factual findings, he was entitled to a federal evidentiary hearing to resolve the factual dispute as to the circumstances under which Thompson gave his confession. We agree that the state trial court made no findings of fact after the Jackson-Denno hearing regarding Thompson's claim of coercion and that the Alabama Court of Criminal Appeals likewise made no factual

findings.[3]  However, we conclude, as a matter of law, that Thompson's version of events, even if true, would not make his statement involuntary, and therefore he is not entitled to relief on this claim.

Under certain circumstances, the Supreme Court has found that police deception invalidates an accused's waiver of the Fifth Amendment privilege.[4]  See, e.g., Lynumn v. Illinois, 372 U.S. 528 (1963) (misrepresentation by police officers that a suspect would be deprived of state financial aid for her dependent child if she failed to cooperate with authorities rendered the subsequent confession involuntary); Rogers v. Richmond, 365 U.S. 534 (1961) (confession involuntary where defendant confessed when police chief pretended that if defendant did not confess the defendant's ailing wife would be arrested).

In this case, unlike in Lynumm and Rogers, Thompson's girlfriend, Shirley Franklin, had voluntarily implicated herself in the murder prior to Thompson's

---

[3] The trial court's ruling admitting his confession as voluntary was based upon an Alabama doctrine known as the "collateral benefits" doctrine. Accordingly, the state court felt it unnecessary to make factual findings.  However, this doctrine had been overruled and held unconstitutional prior to his trial.  As a  result, Thompson argues that he was entitled to an evidentiary hearing pursuant to Townsend v. Sain, 372 U.S. 293, 314  (1963) (holding that where the decision of the state trier of fact rests "upon an error of law rather than an adverse determination of the facts, a hearing is compelled to ascertain the facts.").

[4] The Supreme Court has also  held  that some types of police deception do not render a confession involuntary.  Frazier v. Cupp, 394 U.S. 731, 739 (1969) ( falsely stating that a co-defendant has turned state's evidence); Illinois v. Perkins, 496 U.S. 292, 296-97 (1990) (installing government agents as cellmates to elicit statements).

7

arrest. Although the Supreme Court has not addressed police promises for leniency to a possible co-defendant, this Court has done so in the context of negotiating a guilty plea. See Martin v. Kemp, 760 F.2d 1244, 1247-48 (11th Cir.1985). While significant differences exist between a defendant's plea in open court and a custodial interrogation, the principles addressed by this Court in determining what constitutes police overreaching appear to us equally applicable in this context. In Martin, a habeas petitioner argued that his confession and guilty plea were involuntary because they were prompted by police threats to bring charges against his young pregnant wife. This Court found that while probable cause existed at the time of Martin's plea hearing to file criminal charges against Martin's wife, it was unclear from the record on appeal whether the police had probable cause at the time the threat was actually made. We held that whether a threat to prosecute a third party was coercive depends upon whether the state had probable cause to believe that the third party had committed a crime at the time that the threat was made and remanded for this determination. Id. at 1248-49. See also United States v. Nuckols, 606 F.2d 566, 569 (5th Cir.1979) (remanding for a hearing on whether threats to prosecute defendant's wife were based on probable cause and explaining that "absent probable cause to believe that the third person has committed a crime, offering 'concessions' as to him or her constitutes a species

of fraud."). In this case, Shirley Franklin's own statement established her participation in the crime. She acknowledged that she accompanied Thompson back to the crime scene and held a torch while he again shot into the well, assisted him in cleaning the murder weapon, and then accompanied him to dispose of it. Under the circumstances, the police had probable cause to arrest her at the time A.G. Lang allegedly told Thompson that she could have faced responsibility for the crime. Under the rationale of Martin, the alleged statement regarding Shirley Franklin did not constitute coercion. Accordingly, we reject Thompson's argument that he was coerced into confessing and, thus, find no error in the admission of the confession.

## II. Whether Thompson was denied the effective assistance of counsel.

We now turn to Thompson's argument that he received ineffective assistance of counsel at both the guilt/innocence and sentencing phases of his trial. Ineffectiveness of counsel is a mixed question of law and fact subject to de novo review. Meeks v. Moore, 216 F.3d 951, 959 (11th Cir. 2000). State court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d). Similarly, federal district court findings are deemed correct under Fed.R.Civ.P. 52(a) unless clearly erroneous. See Bush v. Singletary, 988 F.2d 1082, 1089 (11th Cir.1993).

9

A claim of ineffective assistance of counsel must meet the familiar two-prong test set out in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance fell below an objective standard of reasonableness. <u>Id.</u> at 687. Second, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. Thompson argues that counsel's performance during trial fell below the standard of professional conduct required by <u>Strickland</u> because:

> (1) during the opening statement counsel acknowledged that Thompson had robbed Gray, kidnaped her, pushed her down the well, and stood by while Franklin shot her;
>
> (2) in attempting to impeach Shirley Franklin through testimony concerning her lifestyle, her past criminal acts, and her conduct reflecting her remorselessness after the murder, defense counsel implicated Thompson in the same lifestyle and conduct;
>
> (3) counsel abandoned a viable intoxication defense which would have permitted the jury to convict of a lesser included offense; failed to present their own psychiatric expert's report and failed to argue that Thompson's alcohol and drug use on the night of the murder left him with diminished capacity;
>
> (4) counsel's pretrial investigation into mitigation evidence and their preparation for the sentencing phase was deficient, and as a result, counsel failed to present available mitigation witnesses and failed to elicit mitigating testimony from Thompson's mother; and
>
> (5) counsel dehumanized Thompson and distanced themselves from him in the closing argument of the guilt/innocence phase of trial by

10

conceding to the jury that Thompson's lifestyle was alien to most people.

### A. Claims of ineffective assistance of counsel pertaining to the conviction

Giving the state court findings of fact the presumption of correctness, we find no error in the district court's conclusion that Thompson has not established that counsel's performance at the guilt/innocence phase of trial was so unreasonable and prejudicial as to undermine our confidence in the outcome of his conviction. Thompson claims first that it was ineffective and prejudicial for counsel to concede in opening statement that Thompson had robbed and kidnaped Gray and pushed her down the well, even though Counsel also asserted that it was Franklin and not Thompson who had shot her. We find that Counsel's concession of Thompson's participation in the crime was not unreasonable in light of the overwhelming evidence that Counsel knew was going to be presented against Thompson during the trial. First, in every statement Thompson gave to the police and to his lawyers, Thompson had confessed to the robbery and kidnaping. Even when he changed his story and placed the blame for the shooting on Shirley Franklin, he still admitted that he had robbed and kidnaped Gray. His original two confessions indicated that he had already placed Gray in the well and emptied his gun into it before he returned home to obtain more bullets and, accompanied by

11

Shirley, returned and fired additional shots into the well. Later, he told his lawyers and testified at trial that, after he had robbed and abducted Gray, he was panicked and drunk and, not knowing what to do, told Gray to get in the trunk of the car and drove to Franklin's home. After telling Franklin what had happened, they then drove to the well. In fact, Thompson testified at trial that he had told Franklin that they should put Gray in the well and then flee the country and call to tell someone where Gray was. When Thompson refused to shoot Gray after Franklin's insistence that he do so, Thompson said Franklin called him chicken, took the gun and shot into the well.

Counsel knew that the foregoing would be Thompson's testimony at trial. They also knew that Shirley Franklin would testify that it was Thompson who shot Gray in the well, and that she had arrived at the well with Thompson after the fact. They further understood that Thompson's confession after his arrest, corroborating Franklin's version of events, would also be introduced at trial. The record from the state habeas hearing supports the fact that counsel made a strategic decision to present the case as Thompson presented it to them: Thompson was culpable for the robbery and abduction, but he had no intent to murder Ms. Gray and did not participate in the murder. Counsel also testified at the hearing that they conceded Thompson's limited participation to gain credibility for Thompson's testimony that

12

it was Franklin that suggested and carried out the killing. Under these circumstances, we do not find that Thompson has borne his burden of proving ineffective assistance of counsel in this regard.

Thompson next argues that it was ineffective and prejudicial to elicit testimony which implicated Thompson in Franklin's lifestyle, her past criminal acts and conduct reflecting her remorselessness after the murder. Defense counsel testified at the state post-conviction hearing that their strategy at trial was "one of diminished capacity, limited participation, addiction to drugs and alcohol, and remorse." Faced with Franklin's testimony and Thompson's own confession as well as his later story that it was Franklin who had ordered and then carried out the murder, Counsel's course of action was to present a picture of Franklin as an older woman who controlled and manipulated Thompson with drugs and alcohol and was successful in getting him to do her bidding, not only at the well, but in the past as well. Trial counsel sought to discredit Franklin's conflicting testimony by introducing her prior conviction for armed robbery, her record of escapes, the testimony of Connie Pope that Franklin admitted to robbing older men by taking them to motels and knocking them unconscious, as well as an armed robbery of a pizza restaurant in Boaz, Alabama, and the testimony of Thompson that several months prior to the murder he had robbed a store with Franklin and that Franklin

13

had held a gun on the storekeeper.

Thompson argues that it would have been sufficient to impeach Franklin with only the evidence of her prior convictions and escapes and other conduct in which Thompson did not participate. However, counsel was attempting to explain Franklin's domination of Thompson to support his story that it was Franklin who had committed the murder and so elicited testimony regarding Franklin's influence on him and evidence of his actions at her direction on prior occasions. Counsel's strategy to paint Franklin as manipulating Thompson and as the more evil of the two is not beyond the scope of professional representation required by the Constitution when considered in light of what was available as a defense under the circumstances here.

Thompson next argues that Counsel fell below the standard for constitutionally effective counsel by abandoning a viable intoxication defense which would have permitted the jury to convict of a lesser included offense. He argues that Counsel should have presented their own psychiatric expert's report which concluded that Thompson drank as much as a case of beer or a fifth of whiskey a day, had suffered from blackouts since the age of 17, smoked up to a quarter of an ounce of marijuana a day, used Dialaudid, and took approximately 10 milligrams of Valium each day. Thompson also argues that Counsel should have

14

argued that Thompson's alcohol and drug use on the night of the murder left him with diminished capacity.

Prior to trial, trial counsel had filed motions for a psychiatric examination and an independent psychiatric examination. As a result, Thompson was evaluated at Taylor Hardin Secure Medical Facility by a lunacy commission which concluded that although at the time of "the alleged offense, it is possible Mr. Thompson was under the influence of self-administered intoxicants," Thompson was criminally responsible for his actions at the time of the crime. Trial counsel felt that the evidence from the Lunacy Commission that Thompson was competent and that his self-administered intoxicants did not diminish his criminal responsibility could have been harmful to Thompson, and thus, did not present it at trial.

Thompson was also evaluated by Dr. R.A. Sleszynski, a private psychiatrist hired by trial counsel. Counsel testified that they did not present the testimony of Dr. Slezynski because, after discussing the report with Sleszynski, trial counsel felt that Sleszynski was not sympathetic to their client and that his attitude on the witness stand would be detrimental to Thompson. They also believed that Dr. Slezynski's diagnosis that Thompson had an anti-social personality disorder would harm Thompson. Evidence regarding Thompson's dependence on alcohol since he was in his teens and drug use had been otherwise presented to the jury. Counsel

testified that they considered and weighed the competing factors regarding Sleszonski's impact on the jury and made a strategic decision not to use him because the possible harm to their client outweighed the possible benefit. We do not find error in the state and district court's finding that trial counsel's performance in this regard did not fall below the standard of professional performance enunciated in Strickland.

## B. Claims of ineffective assistance of counsel pertaining to the penalty phase

Thompson first argues that his trial attorneys' performance at the sentencing phase was ineffective because counsel performed little pretrial investigation of mitigation evidence and no preparation for the sentencing phase of trial. As noted above, to prevail in an ineffective assistance of counsel claim a petitioner must prove both that counsel's actions or omissions were deficient and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. A "reasonable probability" need not be proof by a preponderance that the result would have been different, but it must be a showing "sufficient to undermine confidence in the outcome." Id. See also Williams v. Taylor, 529 U.S. 362, 391 (2000).

At the state hearing, Thompson introduced the following evidence of mental

16

problems and a troubled family history which he contends should have been presented at trial. Thompson's mother, Joyce Parker, testified that her husband, Thompson's father, beat her and all of her children, even while she was pregnant and that, in addition to the violence Thompson suffered at the hands of his father, he had also witnessed his grandfather shoot his father in the shoulder in an attempt to protect Thompson's mother.

Thompson's mother also noted that it was after his father was killed when Thompson was seventeen years old that Thompson began using drugs and drinking more. She attributed this to the fact that Thompson was blamed by his grandmother for his father's death and felt tremendous guilt.[5] She described Thompson as a compassionate person who was good with children and reported that on one occasion Thompson helped a homeless man find shelter and provided him with food. Finally, she testified that there was a period of time when Thompson was trying to "live right" and was going to church, and she believed at that time that Thompson would become a preacher. She testified that Dobson and McPherson, Thompson's lawyers, never contacted her prior to trial, but that she

---

[5] According to Dr. Beidleman's testimony at the state habeas hearing, Thompson was involved in an argument over payment for work and his father took it upon himself to confront the man he felt wronged his son. Thompson's father was shot and killed during the confrontation and Thompson found his father's body. Thompson felt he was a coward for not avenging his father's death.

17

managed to track them down over the phone and spoke with them briefly. She briefly spoke with counsel a second time, during trial, and spoke with them a third time toward the end of trial when they asked her to beg the jury for his life.

Alford Lett, Thompson's uncle, testified that he had seen Thompson on at least a weekly basis throughout his life until Thompson moved in with Franklin. He testified that Thompson "had a rough . . . childhood, all the way through" because of his father's drinking and physical abuse and that Thompson's father had provided Thompson with liquor since the age of 10 or 12. He also testified that he had at times employed Thompson in his sheetrocking business and that he knew Thompson to be a good worker who would walk away from trouble rather than fight. Finally, he stated that he was available to testify but was never contacted by defense counsel.

Leona Thompson, Thompson's sister-in-law, testified that she had known Thompson for eight years and described him as a kind person who had gone with her to the hospital when she was giving birth to her son. She said that Thompson had babysat for her son when he was three months old and approximately four or five other times and had taken her and her son to dinner. She testified that she was present during the trial and would have testified, but was never contacted by Thompson's attorneys.

18

Reverand Jerry Fleming, pastor of the church in Thompson's home town, testified that Thompson attended his church meetings regularly from March through July of 1984, and that during this period he was "on fire for God" and deeply concerned about his mother's spiritual well-being. He also testified that Thompson was among a group of people seeking to leave behind a life of addiction to drugs and find the "straight path." After Thompson stopped attending church in July, Fleming spoke with Thompson and learned that Thompson was looking for another job because he could not resist the peer pressure at his present job. Fleming said that he had been available to testify at trial in 1985 but was never contacted by defense counsel.

Thompson testified about his alcohol and drug problems, his violent upbringing, the traumatic experiences in his life and head injuries he received as a child.

Finally, Thompson introduced the testimony of Dr. Beidelman, a clinical psychologist hired by Thompson's collateral counsel to evaluate Thompson. Dr. Beidelman had interviewed Thompson and his mother, administered psychological tests, and reviewed the records in this case. Based on this information, he opined that Thompson began abusing alcohol to escape the violence in his home, becoming dependent on it before he was 10 and began using other drugs at age 14

19

under the assistance and influence of his brother; that Thompson felt he was a coward for not avenging his fathers death; and that Thompson became involved with Shirley Franklin, a 35 year old woman, when he was 25 and became dependent on her because she bought him drugs and alcohol.

At the hearing, Thompson's trial counsel also testified. They both stated that prior to trial, they met with Thompson numerous times and discussed his defense, trial strategy, and procedures and continued to do so during trial, each morning and each evening after proceedings were adjourned. They testified that they prepared jointly for the guilt and sentencing phases of trial because they believed that Thompson's penalty phase defense was consistent with his defense at trial which was "one of diminished capacity, limited participation, addiction to drugs and alcohol, and remorse." In preparing for this case, they visited the scene of the crime, interviewed law enforcement personnel involved in the investigation of this case, searched for witnesses in the community, spoke with Thompson's mother about his childhood, and interviewed every person that Thompson named as being a possible witness for him, both with respect to the crime and mitigation. They did not find anyone in the community to testify on Thompson's behalf, except for two of his friends, Jackie Pope and Connie Pope, and his mother, Joyce Parker. In addition, counsel interviewed Thompson's brother before trial, but his

20

brother said that he did not want to say anything that could hurt Thompson. Trial counsel also asked Thompson about his childhood, educational background, and drug and alcohol problems. They questioned Thompson about his religious affiliations and he denied any. Trial counsel also advised Thompson as to the importance of his testifying during the penalty phase and the possible negative effects of his failure to testify. They urged Thompson to testify at the penalty phase but he refused.

Defense counsel described their trial strategy as twofold. First, they sought to cultivate sympathy for and humanize Thompson by presenting Thompson's testimony regarding his drug and alcohol problems and the trauma he suffered as a result of his father's death and by arguing addiction to drugs and alcohol and remorse. Second, they sought to argue diminished capacity and limited participation through the cross-examination of Franklin which they believed would expose that she "was motivated by either lover's revenge, money, or something."

In rebuttal, the State introduced a transcript of one of the conversations between Thompson and his attorneys prior to Thompson's trial, which had been taped by trial counsel. In the taped conversation Thompson told counsel that he had kidnaped and robbed Gray, but it had been Shirley Franklin who had ordered her into the well and shot her. Counsel had advised Thompson that relying on that

21

version of events at trial might lead to the prosecution of Franklin for capital murder and Thompson asserted that he would stand by that version of events because it was true. The tape also reveals that counsel discussed Thompson's defense at trial, including a possible insanity or diminished capacity defense as well as the procedures required to establish such a defense.

The state trial court found that Thompson's attorneys were credible witnesses and credited their version of the facts, finding that Thompson's attorneys were in frequent contact with Thompson, extensively discussed trial strategy with him, and interviewed all persons identified by him as possible witnesses at trial and discredited Joyce Parker's testimony that she had not been contacted. Additionally, the state court found that because Thompson had testified at trial regarding his drug and alcohol abuse and his father's murder and there was other evidence of his dependence on drugs and alcohol, much of the mitigating evidence offered at the hearing would have been cumulative. Finally, the state court found that the testimony of Thompson's witnesses was "far from compelling and does not create a reasonable probability that, had it been presented, Thompson would not have been sentenced to death."

Under the facts of this case, we cannot say that the state and district court erred in concluding that no reasonable probability exists that "but for" counsel's

failure to present additional mitigating evidence the results of the sentencing phase would have been different. We have considered both the evidence presented at the trial and the mitigation evidence presented at the state habeas hearing. Although more evidence could have been presented, both Thompson and his mother had testified to his abused childhood, his history of drug and alcohol abuse, and the effect of his father's murder upon him. Thompson has not shown that there is a reasonable probability that the additional testimony presented at the habeas hearing, which Thompson asserts should have been presented at trial, would have resulted in a different outcome. The quality and quantity of this testimony in mitigation must be weighed against the aggravating factors of this robbery and kidnaping, and the manner and method of the murder. We cannot say that there is a probability "sufficient to undermine confidence in the outcome" of this case under the circumstances presented by the aggravating and available mitigating circumstances in this case.

Finally, Thompson argues that Counsel predisposed the jury to impose the death penalty by making statements at the closing argument of the guilt/innocence phase that distanced themselves from Thompson and dehumanized him in the eyes of the jury. In this case, Counsel informed the jury that they were court appointed. With this backdrop, counsel stated in the closing argument of the guilt/innocence

23

phase:

> It is, I think, further indicative to know that these people that you have heard testify here this week, to the large part of our population, live in a foreign and strange and alien atmosphere and environment. Most people in this county, in fact, the overwhelming majority don't lie around all day drinking and smoking pot and playing cards. Most of us have a job that we go to. While some of us may not have the best jobs in the world, and Rocky Balboa said in the movie Rocky, it's a living. We do it. So, most of that sort of activity is alien and foreign to our concept of morality and how we look at the way civilized and normal human beings ought to act.
>
> . . .[Thompson has had] one traumatic experience after another: living on the fringes of society, outside all acceptable modes or normal behavior, taking up with a 35 year old woman and living with her. And in order to satisfy his and her drug habit and their lust, they have engaged in robbery, clear and undisputed. They have engaged in other activities outside and alien to the law.

Thompson argues that these comments were prejudicial and relies on our decision in Horton v. Zant, 941 F.2d 1449 (11th Cir. 1991), for support. In that case, we recognized that counsel "virtually encouraged the jury to impose the death penalty" where counsel told the jury that "the one you judge is not a very good person . . . I ask you for the life of a worthless man," and, "the prosecutor's closing made me hate my client" followed by:

> But then, I . . . try to be reasonable about the whole situation; and I don't hate him as much . . . Mr. Briley has admirably told you just exactly why it is that Jimmy

24

> Lee has got to die. And it becomes my turn to try and explain to you why you don't have to say he's got to die . . . I find my task virtually impossible . . . Maybe Mr. Briley is right, maybe he is not. Maybe he ought to die, but I don't know.

Id. at 1462. See also King v. Strickland, 714 F.2d 1481, 1491 (11th Cir.1983), vacated on other grounds, 467 U.S. 1211 (1984), adhered to on remand, 748 F.2d 1462 (11th Cir.1984); Blanco v. Singletary, 943 F.2d 1477 (11th Cir. 1991).

Although not as egregious as the statements in Horton, counsel's statements in closing, as well as counsel's disclosure to the jury that they were court appointed, hardly comports with the fundamental duty of loyalty to a client and of ensuring "that the adversarial testing process works to produce a just result under the standards governing decision." Strickland, 466 U.S. at 687. Counsel could hardly hope to persuade a jury to be merciful while at the same time stressing the immoral and worthless quality of their client's life and also reminding the jury that they were appointed by the court to represent Thompson. As we explained in Goodwin v. Balkcom, 684 F.2d 794 (11th Cir. 1982), "reminding a jury that the undertaking is not by choice, but in service to the public, effectively stacks the odds against the accused." Id. at 806. We reiterate that a lawyer does not serve his or her client by telling the jury that they have been court appointed. Moreover, although we recognize the need to develop and maintain credibility and rapport

25

with the jury, it is unreasonable for trial counsel to do so at the expense of the client's best interests.

Nonetheless, in view of the entire record, we find that Thompson has not shown a reasonable probability that counsel's performance affected either the jury's verdict that he was guilty of capital murder or the jury's recommendation of death.

Thus, for the foregoing reasons, Thompson's conviction and the sentence imposed upon him  must be

**AFFIRMED.**