UNITED STATES of America,
Plaintiff,

v.

Nolan HEBRON, Defendant.

No. CRIM.A.02–23–JJF.

United States District Court,
D. Delaware.

Jan. 15, 2003.

Colm F. Connolly, United States Attorney, and Leonard P. Stark, Assistant United States Attorney, United States Attorney's Office, District of Delaware, Wilmington, DE, for Plaintiff United States of America.

Penny Marshall, Federal Public Defender, Federal Public Defender's Office, Wilmington, DE, for Defendant Nolan Hebron.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is Defendant Nolan Hebron's (hereinafter "Defendant") Motion to Suppress Evidence (D.I.19). For the reasons set forth below, the motion will be denied.

## I. Nature and Stage of the Proceedings

Defendant has been charged by indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g) and knowingly possessing a firearm which is not registered to him in violation of 26 U.S.C. §§ 5861(d) and 5871. Defendant moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) and the Fourth Amendment of the United States Constitution to suppress any and all evidence obtained as a result of the search and seizure of the Defendant on January 12, 2002.

The Court held an evidentiary hearing on the instant motion and the parties submitted briefs outlining their respective positions. This Memorandum Opinion sets forth the Court's findings of fact and conclusions of law regarding the instant motion. (D.I.19).

## II. Legal Standard on a Motion to Suppress

Rule 41(f) of the Federal Rules of Criminal Procedure provides that "[a] motion to suppress evidence may be made in the court of the district of trial as provided in Rule 12." Fed.R.Crim.P. 41(f). Rule 12 provides that suppression motions should be made prior to trial. See Fed.R.Crim.P. 12(b)(3), (f).

 The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right. *See United States v. Padilla,* 508 U.S. 77, 81–82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993); *Government of Virgin Islands v. Williams,* 739 F.2d 936, 938 (3d Cir.1984). The burden of establishing standing to raise a Fourth Amendment challenge rests with the defendant. *See United States v. Salvucci,* 448 U.S. 83, 86–95, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois,* 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In order to establish standing, the individual challenging the search must have a reasonable and actual expectation of privacy in the property searched. *See Rawlings v. Kentucky,* 448 U.S. 98, 104–106, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).

 Ordinarily, once standing is established, a defendant who files a motion to suppress carries the burden of proof. *See United States v. Lewis,* 40 F.3d 1325, 1333 (1st Cir.1994). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement. *See United States v. Herrold,* 962 F.2d 1131, 1137 (3d Cir.1992).

### III. Findings of Fact

1. On January 12, 2002 at approximately 8:20 a.m. Officers Leccia and Harvey of the City of Wilmington Police Department, while patrolling the 600 Block of West Fifth Street in Wilmington, Delaware in a marked police vehicle, observed Defendant, Nolan Hebron, walking on the south side of West Fifth Street. (Transcript of Hearing on Motion to Suppress ("Tr.") at 4).

2. Officers Leccia and Harvey believed Mr. Hebron matched the description of a suspect wanted for a burglary that had occurred on the same block approximately three to four days earlier. (Tr. at 6, 18). The description the officers remembered of the burglary suspect was that he was a black male with a light to medium complexion, wearing a three-quarter length black jacket with a brown fur hooded collar. *Id.* Mr. Hebron is a black male and was wearing a three quarter length black jacket with a brown fur collar, at the time the officers observed him. (Tr. at 37).

3. The relevant burglary was domestic related and the victim stated that the perpetrator normally "hangs out in the area" harassing her. *Id.*

4. After observing Mr. Hebron, who was unknown to them, the officers searched the name they had for the burglary suspect through the computer system in their patrol vehicle. The computer system responded that the name of the wanted burglary suspect was Richard Wright, and indicated that Mr. Wright was still wanted for the burglary charges. (Tr. at 7).

5. While checking for information on the computer system, the officers were traveling northbound on Sixth Street, and after turning right from Sixth Street on to Jefferson Street, the officers again observed the Defendant. (Tr. at 7). The officers continued to follow the Defendant as he approached Fourth Street. *Id.*

6. The officers then proceeded to the south side of Jefferson street (going the wrong way on a one way street) and rode alongside the Defendant. (Tr. at 8–9) The exact distance between Mr. Hebron and the police car at this time is unclear. (Tr. at 8, 24–25).

7. As the officers followed Mr. Hebron, Officer Harvey said to the Defendant "hey,

boss, why don't you come over here?" (Tr. at 8). In response, the Defendant turned and looked at the police officers and then immediately began running. (Tr. at 9).

8. Officer Harvey ordered the Defendant to stop, however, the Defendant kept running towards Madison Street. (Tr. at 9).

9. Officers Leccia and Harvey turned on their emergency lights and requested assistance from other units, giving the assisting units a description of Mr. Richard Wright, whom Officers Leccia and Harvey thought they were pursuing. (Tr. at 8–9). The description provided by Officers Leccia and Harvey at the time of the chase was a "black male, 3/4 length black jacket with a brown fur collar, he's about 5'6", 170, has a black knot hat, black pants." [1] (Def. Exhibit 3).

10. Officers Leccia and Harvey followed the Defendant as he turned left down Madison Street, went through an opening in a fence and continued toward a McDonalds restaurant. The Defendant then jumped over another fence into the "drive through" lane at the McDonalds. (Tr. at 10).

11. Officers Leccia and Harvey lost sight of the Defendant for approximately thirty seconds to a minute and proceeded to the McDonalds' parking lot where they believed the Defendant had run to. (Tr. at 10–11, 39).

12. Officer Leccia remained in the marked patrol vehicle while Officer Harvey went inside the McDonalds to see if the Defendant had run inside. At the same time, an officer who was assisting Officers Leccia and Harvey at the McDonalds restaurant advised that he was flagged down and told that "the subject that was running from the police ran into a black vehicle in the parking lot." (Tr. at 11). Additionally, Officer Harvey testified that more than one person inside the McDonalds restaurant indicated that the subject he was chasing had run into the black vehicle next to a van in the McDonalds' parking lot. (Tr. at 11, 12).

13. There was one black vehicle in the McDonalds' parking lot. (Tr. at 12). Officer Leccia stood in front of the black vehicle, while Officer Harvey stood at the passenger side rear and an Officer Karscner stood on the driver side rear. (Tr. at 12). Officer Leccia could not see anyone in the vehicle from his position, which was at the front of the vehicle. Officer Leccia testified that the front windows were not heavily tinted. (Tr. at 12, 41).

14. Officers Harvey and Karschner checked the vehicle and found the doors were unlocked. (Tr. at 12). They proceeded to open the back doors and found Mr. Hebron seated in the back seat of the vehicle, leaning towards the driver's seat. (Tr. at 12).

15. Mr. Hebron was taken out of the vehicle and placed under arrest for resisting a police officer. (Tr. at 12). After Mr. Hebron was removed from the vehicle, Officer Leccia looked inside the vehicle and saw a jacket "stuffed" on the driver's side rear floor board. (Tr. at 14, 46). Officer Leccia reached into the car and removed the jacket. (Tr. at 14). As Officer Leccia was holding the jacket, a loaded nine millimeter pistol fell out of the jacket and hit the pavement outside of the vehicle. (Tr. at 14).

---

1. Officer Leccia does not specifically remember looking up this description for Mr. Wright, but indicated that his partner probably got this information on the computer system. (Tr. at 22–23). Officer Leccia also testified that he probably got this description from the computer system screen rather than the suspect they were in pursuit of. (Tr. 23–24).

16. Officer Leccia unloaded the ammunition from the gun, and proceeded to examine the jacket. He found a dry cleaning receipt in the pocket of the jacket with Defendant's name on it. (Tr. at 16).

17. The Officers continued to search the vehicle. Officer Leccia leaned in the vehicle through the passenger side rear and found a loaded sawed-off shotgun, Remington 87 series, that was wedged between the driver's seat and the center console. (Tr. at 16). He also found a black bag containing duct tape, rubber gloves and door popping tools. (Tr. at 16).

18. The vehicle in which Defendant was found is a 2001 Black Dodge Stratus with Maryland license plates and is not registered to the Defendant. (D.I. 25 at 2).

## IV. CONCLUSIONS OF LAW

### A. The Initial Contact by Officers Leccia and Harvey With the Defendant

1. The Fourth Amendment provides: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV.

■ 2. A police officer may make a limited investigatory stop of an individual when the officer has a reasonable suspicion, based on express facts taken together with rational inferences from those facts, that the person has engaged, or is about to engage, in criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Such a stop is justified by less than the probable cause standard necessary for an arrest. *See United States v. Brown*, 159 F.3d 147, 149 (3d Cir.1998).

■ 3. Where the stop exceeds the limited investigatory purpose set out in *Terry v. Ohio* and becomes confinement, such confinement must be justified by probable cause. *See Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The Third Circuit Court of Appeals has stated that probable cause is

defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense. This standard is meant to safeguard citizens from rash and unreasonable interferences with privacy and to provide leeway for enforcing the law in the community's protection. We have stated that [t]he determination that probable cause exists for a warrantless arrest is fundamentally a factual analysis that must be performed by the Officers at the scene. It is the function of the court to determine whether the objective facts available to the officers at the time of arrest were sufficient to justify a reasonable belief that an offense [had been] committed. A court must look to the totality of the circumstances and use a common sense approach to the issue of probable cause.

*Sharrar v. Felsing*, 128 F.3d 810, 817–18 (3d Cir.1997). (citations and internal quotations omitted)

■ 4. The Supreme Court has held that a seizure occurs for purposes of the Fourth Amendment in the context of an arrest or an investigatory stop when (1) physical force is applied by the police on the suspect; or (2) when the suspect submits to an officer's assertion of authority. *California v. Hodari D.*, 499 U.S. 621, 626–27, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). A show of authority by police to which a suspect does not yield is insufficient. *Id.*

5. In *Hodari,* officers patrolling at night in a high crime area in Oakland, California, found several youths gathered around a car. When the youths saw the police car approach, they took flight. The officers became suspicious and gave chase. An officer followed Defendant Hodari on foot and as the officer caught up to Hodari, he discarded a small rock of cocaine. Subsequently, the officer tackled Hodari and placed him under arrest. *Hodari D.,* 499 U.S. at 622–23, 111 S.Ct. 1547.

6. Hodari moved to suppress the cocaine, arguing that officers did not have reasonable suspicion to stop him under *Terry v. Ohio,* 392 U.S. 1, 21, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The central question was whether Hodari was "seized" within the meaning of the Fourth Amendment at the time he dropped the cocaine. The United States Supreme Court concluded that since Hodari did not comply with the officer's show of authority, he was not seized for Fourth Amendment purposes until he was tackled. *Hodari D.,* 499 U.S. at 629, 111 S.Ct. 1547.

7. The fact that a police officer orders a fleeing individual to stop does not constitute a seizure unless and until the individual submits to that order, and therefore, the cocaine Hodari abandoned while he was running was not the fruit of a seizure, and his motion to suppress was denied. *Id.*

8. In the Court's view, the facts of the instant case fall within the decision in *Hodari.* Officers Leccia and Harvey were on patrol in the 600 Block of West Fifth Street in Wilmington, Delaware at approximately 8:20 a.m. The Officers observed the Defendant walking on the south side of the street and believed the Defendant matched the description of a person wanted for a burglary which had occurred in the same area. (Tr. at 6, 18, 37).

9. The officers rode parallel to the Defendant in their marked police vehicle as one of the Officers said to the Defendant, "hey, boss, why don't you come over here?" (Tr. at 8). The Defendant ignored the request and immediately began running. (Tr. at 9).

10. As the Defendant was running, Officer Harvey told the Defendant to stop because he was going to get caught. (Tr. at 9).

11. The officers chased the Defendant, losing sight of him for approximately thirty seconds to a minute. (Tr. at 10–11, 39).

12. Several customers in a McDonalds restaurant told Officer Harvey that the suspect had gone into a black vehicle in the McDonalds parking lot. (Tr. at 10–11, 39). The officers approached the black vehicle, opened the door and seized Defendant. (Tr. at 12).

13. At no point prior to the Defendant's seizure from the black vehicle did the officers apply physical force to him. At no point prior to the Defendant's seizure from the black vehicle did he submit in any way or yield to the officers' show of authority. Accordingly, applying the standards of the *Hodari* decision, the Court concludes the Defendant was not seized for Fourth Amendment purposes when he was initially approached and spoken to by the officers.

14. Defendant contends that he was seized before he fled from the officers. (D.I. 30 at 7–8). Although the Defendant argues that he believed he was not free to leave when Officer Harvey stated, "hey boss why don't you come over here?", the Court concludes that the Defendant did not submit to Officer Harvey's show of authority, and therefore, was not seized.

15. In sum, the Court concludes that because Defendant did not comply with the officers' show of authority, he was not seized for Fourth Amendment purposes

until he was found and arrested in the black vehicle. For this reason, the Court concludes that the officers' initial contact with the Defendant cannot be a basis for suppressing the evidence that was subsequently discovered in the vehicle from which the Defendant was seized.

## B. The Seizure of the Defendant From the Vehicle

1. Because the Defendant was not seized within the meaning of the Fourth Amendment prior to his being found in the black vehicle in the McDonalds' parking lot the Court's suppression analysis must begin there.

2. At the time the officers seized the Defendant from the vehicle, they were aware of the following facts:

a. Defendant was a light-skinned black male wearing a black three-quarter length jacket with brown fur on the collar, who matched the description of a wanted burglary suspect. (Tr. at 6, 18, 37).

b. Defendant was seen on the street two houses away from the scene of the burglary committed a few days prior by the suspect whose description he matched. (Tr. at 6, 18).

c. Defendant fled when officers approached him on a public street and persisted in his flight despite lawful orders to stop. (Tr. at 9).

d. Several reports from both an officer and customers in the McDonalds restaurant indicated that the Defendant ran into a black vehicle in the McDonalds' parking lot and there was only one parked black vehicle in the lot.[2] (Tr. at 11).

3. In view of the facts set out in Paragraph 2 above, which were known to the officers who chased the Defendant to the McDonalds' parking lot, the Court con-

cludes that under the totality of the circumstances, there was reasonable suspicion for the officers to seize the Defendant from the black vehicle. Therefore, the seizure and arrest of the Defendant was lawful under the Fourth Amendment.

## C. The Search of the Vehicle

1. The Defendant contends that the search conducted by Officer Leccia subsequent to his seizure and arrest violated the Fourth Amendment in that it was a warrantless search for purposes of the Fourth Amendment.

2. The Government contends that the Defendant lacks standing to object to the warrantless search of the black vehicle that occurred subsequent to his seizure and arrest and during which police seized a loaded nine millimeter pistol, a sawed-off shotgun and a black bag containing duct tape, rubber gloves and door popping tools. (D.I. 32 at 6).

3. The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right. *See United States v. Padilla*, 508 U.S. 77, 81–82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993); *Government of Virgin Islands v. Williams*, 739 F.2d 936, 938 (3d Cir.1984). The burden of establishing standing to raise a Fourth Amendment challenge rests with the defendant. *See United States v. Salvucci*, 448 U.S. 83, 86–95, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980); *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

4. In order to establish standing, an individual challenging a search must have a reasonable expectation of privacy in the property searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 104–106, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). With regard

---

**2.** The radio run that the officers were monitoring indicated that the suspect ran into "the van next to the corner of McDonalds." (Defense Exhibit 3).

to an expectation of privacy in a motor vehicle, outright ownership is not required, but there must be "clear evidence of continuing possession and control, as well as no evidence that the driver obtained the car illegitimately." *United States v. Baker*, 221 F.3d 438, 443 (3d Cir.2000) (standing found where defendant had substantial control over motor vehicle that he borrowed from friend by driving it for four to six weeks and having possession of keys).

5. In the instant case, the vehicle that was searched, is not registered to Defendant. (D.I. 25 at 2). The Defendant has not alleged any "clear evidence of continuing possession and control." [3] *See Baker*, 221 F.3d at 443.

■■■ 6. Based on the record before it, the Court concludes that Defendant has failed to meet his burden of establishing standing to challenge the search of the vehicle. Defendant did not own the vehicle or have consent to use it; thus, the Court concludes that he had no reasonable expectation of privacy in the vehicle.

7. All of the evidence the Defendant seeks to suppress was obtained as a result of the officers' warrantless search of the vehicle; however, the Court concludes that the Defendant lacks standing to challenge the search of the vehicle, and therefore, Defendant's motion must be denied.

## V. CONCLUSION

For the reasons discussed, the Defendant's Motion to Suppress Evidence (D.I.19) will be denied.

An appropriate Order will be entered.

3. Defendant did not address the issue of standing or the ownership or possession of the vehicle. ( D.I. 32 at 6 n. 6) (noting that Defendant did not address the standing issue at the hearing or in its opening brief, despite the fact that the government raised the issue in its pre-hearing submission).