UNITED STATES of America,

v.

David SANTOS; Ivonne Marrero, aka Ivonne Coloma, aka Ivonne Santos, Defendants.

No. CRIM. 03–201(JAG).

United States District Court, D. New Jersey.

Sept. 29, 2004.

Christopher J. Christie, United States Attorney, By Lisa Rose, Assistant U.S. Attorney, U.S. Department of Justice, Newark, NJ, for the Government.

Stephen Turano, Esq., Klingeman Turano LLC, Madison, NJ, for the Defendant David Santos.

Kenneth W. Kayser, Esq., East Hanover, NJ, for the Defendant Ivonne Marrero.

## AMENDED OPINION

GREENAWAY, District Judge.

This matter is before this court on defendants David Santos' and Ivonne Marrero's [1] motions to suppress evidence recovered in connection with a search of defendant David Santos' apartment located at 408 Summer Avenue in Newark, New Jersey. The question presented is whether the Fourth Amendment's exclusionary rule applies to the fruits of this

---

1. Defendant Ivonne Marrero has filed a *pro se* motion to suppress any and all statements and any physical evidence seized. (*See* Defendant Ivonne Marrero, Motion to Suppress Any and All Statements and All Physical Evidence, dated 8/20/03). Ms. Marrero does not have standing to challenge the initial stop of Mr. Santos, nor grounds to suppress any subsequent statements made by him. *See Alderman v. United States*, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) ("the established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself. . . ."). With respect to the evidence found at the 408 Summer Avenue apartment, the Government has attempted to argue that Ms. Marrero shared the apartment with Mr. Santos, and that she voluntarily consented to a search of the premises. (*See* Memo of the United [sic] in Oppo'n to Def. Ivonne Marrero's *Pro Se* Mot. to Suppress and in Support of the Government's Cross–Mot. for Reciprocal Disc. at 19, dated 9/4/03.) This Court has found it unnecessary to make a ruling as to whether Ms. Marrero had authority to consent to a search of the apartment, nor has it addressed the related inquiry of whether she had a privacy interest in the apartment, finding Ms. Marrero's consent invalid in any event. (*See infra* at 18.) Consequently, to the extent the government seeks to introduce evidence seized at the 408 Summer Avenue Apartment against Ms. Marrero, it is also suppressed.

search, namely weapons, drugs and drug paraphernalia recovered from the apartment, as well as statements made by defendant David Santos to agents of the Newark Field Division of the Drug Enforcement Administration ("DEA") subsequent to his arrest. This Court finds that the search of the apartment at 408 Summer Avenue violated Defendants' Fourth Amendment right to be free from unreasonable searches and seizures. The statements of Mr. Santos, obtained in connection with the illegal search and seizure, were tainted by the initial search's unconstitutionality. Therefore, Defendants' motion to suppress the evidence seized from the apartment, as well as David Santos' motion to suppress his post-arrest statements, shall be granted.

## BACKGROUND

In cases such as these, where judgment rests on sorting out competing versions of the facts, issues of credibility are key. The Court is presented with vastly different versions of what occurred in the early morning hours of August 3, 2002. This Court must look at the totality of circumstances, and determine which version of the facts has the appeal of logic, common sense, and reason. The following outlines the essential elements of each party's version of the facts, as distilled from nine days of witness testimony.[2]

*Officers' Testimony*

The government called detectives Ojeda, Vasquez, Walker, and DEA Special Agent Beckett to the stand. Notably, Lieutenant O'Connor, the detectives' supervising officer on the night in question, did not testify. The government witnesses claim that at approximately 1:00 a.m. on August 3, 2002, Lieutenant O'Connor, and detectives Brown, Vasquez, Ojeda, and Walker, all members of the Auto Theft Task Force of the Newark Police Department, were traveling in three unmarked police vehicles southbound from Arlington Avenue in tandem formation on Summer Avenue in Newark, New Jersey, on routine patrol. Lieutenant O'Connor (in the lead vehicle) observed a red Ford Explorer sports utility vehicle (the "SUV") parked on Summer Avenue with a license plate hanging askew from the rear of the vehicle. Several males were approaching the vehicle. Lieutenant O'Connor, aware that the area was known for a high incidence of stolen cars, initiated a tactical maneuver whereby the officers "boxed-in" the SUV by placing their cars immediately in front, behind, and adjacent to the parked SUV. As the officers moved into the tactical position, David Santos passed a black bag to one of the other males with him, the only juvenile in his company, continued walking to the SUV, and entered it on the driver's side. A third male, in the meantime, dropped three clear plastic bags to the ground. The black bag was later determined to contain over $10,000 in cash. The clear plastic bags contained approximately 50 grams of uncut cocaine.

The officers exited their vehicles and Mr. Santos was asked for his driving credentials. The other individuals, who were not in control of the motor vehicle, were not asked for identification. Mr. Santos told Detective Vasquez that his driver's "license was up in me and my girl's apartment." The officers were directed by Mr. Santos to retrieve his license from his apartment. Once the officers were satisfied the car was not stolen, two detectives proceeded to 408 Summer Avenue, a multi-family house with one single family apartment on each of the two floors. Mr. Santos' apartment, the officers were told, was on the second floor.

---

**2.** The parties were heard by the Court on January 8, March 23, March 24, April 2, April 5, April 12, April 16, April 19, April 26, and April 27 (closing arguments), of 2004.

After entering the apartment building through an unlocked front door, the officers walked to the second floor and knocked on a door marked # 2. They waited several minutes with no response, and started back downstairs when they heard a female voice say "wait." Ivonne Marrero opened the door which entered into the apartment's kitchen. While questioning Ms. Marrero as to whether she had Mr. Santos' driver's license, they observed behind her various narcotics and measuring instruments in plain view on the kitchen table.

The officers entered the apartment. While securing the premises, the police found Ms. Marrero's six-year old son asleep on a mattress in the bedroom of the apartment which lay directly on the floor. The officers observed the nose of a weapon protruding from under the mattress. After removing the child, and searching under the mattress, the officers found several other weapons (including a two-shot rifle and various pistols) and numerous boxes of ammunition. The officers also found additional narcotics and drug-related paraphernalia on and under the kitchen table including substantial amounts of cocaine, heroin, and marijuana.

After securing the premises, Lieutenant O'Connor yelled down from the apartment window for the officers to place Mr. Santos under arrest. Officer Brown was summoned upstairs and asked to bring a consent-to-search form, which Lieutenant O'Connor read to Ms. Marrero, and which she voluntarily signed.

Mr. Santos, Ms. Marrero, and two of the males with Mr. Santos were arrested, charged with narcotics and weapons offenses, and taken to a Newark police precinct. Mr. Santos was also written a summons for not having a driver's license. The DEA was contacted to consider federal prosecution of the case given the quantity of drugs found.

Within a few hours of arriving at the Newark police precinct Mr. Santos met with DEA Special Agent Carl Beckett, who was accompanied by his supervisor, Tracy Childress, as well as Lieutenant O'Connor and a Sergeant Melilo. Agent Beckett explained who he was, told Mr. Santos that he was in a lot of trouble, and stated that it was in his best interest to cooperate. Mr. Santos told Agent Beckett that his cooperation was contingent on having his girlfriend, Ms. Marrero, released. Agent Beckett made no promises, but represented that he would attempt to have the federal charges against Ms. Marrero dropped.

Several hours later Agent Beckett returned to the Newark police precinct with his partner, Cliff Spencer, and Tracy Childress. Mr. Santos was transported to the DEA building whereupon Agent Beckett interviewed Mr. Santos with Agent Spencer and Detective Vasquez present. Mr. Santos was given Miranda warnings, but he declined the assistance of counsel. Mr. Santos made incriminating statements including the fact that he had been on his way to his drug supplier, and statements regarding his procurement of the narcotics and weapons. Mr. Santos also provided information and cooperation with respect to the alleged source of the narcotics.

*Defendants' Testimony*

The Defense called Victor Camacho, who was with Mr. Santos on the night in question, Tarrance Vincent, a resident of Summer Avenue, his mother Andrea Vincent, and defendants David Santos and Ivonne Marrero to the stand. Not surprisingly, the Defense witnesses' version of the facts is markedly different from that offered by the government. According to the defense, on August 3rd Victor Camacho, AO [3]

---

**3.** "AO" is a juvenile defendant in a related case.

, Enrique Vega, and Darwen Abudeye, arrived at David Santos' apartment around one in the morning to return Santos' SUV, which they had borrowed. After these individuals rang Mr. Santos' apartment bell (located on the first floor of the house), Mr. Santos came downstairs from his second floor apartment at 408 Summer Avenue and exited the apartment building. While still on the porch of the house, Mr. Santos' cell phone rang and he passed the bag he was carrying, which contained over $10,000 in cash, to AO in order to answer the call. As he approached the SUV, but before he entered it, three unmarked police cars pulled up and five officers exited their vehicles. Detective Walker approached Mr. Santos first, and asked for papers for the car, which Mr. Santos retrieved by reaching into the SUV. Lieutenant O'Connor, in the meantime, approached Mr. Santos from his other side holding a gun to his head.

Mr. Santos, Mr. Vega, and Mr. Camacho were handcuffed and placed in a seated position on the ground in the street behind the SUV and in front of one of the police cars. AO and Mr. Abudeye were placed in the police car. Mr. Santos was asked where he was coming from to which he replied, "my girlfriend's house but she wasn't home," and indicated that the house was in the opposite direction, in fact, of where the 408 Summer Avenue apartment was located. Mr. Santos was never asked for his driver's license.

While Mr. Santos was seated on the ground, Lieutenant O'Connor checked his pockets and removed his keys. Keys were also taken from Mr. Camacho and Mr. Vega. Lieutenant O'Connor and detectives Ojeda and Brown went to several homes alongside of 408 Summer Avenue and attempted to gain entry with the obtained keys because they were uncertain of Mr. Santos' accurate apartment location. At some point one of the detectives stated that he saw the detained individuals come from the apartment house number 408. Lieutenant O'Connor and detectives Walker and Ojeda entered the building by unlocking the front door.

Ivonne Marrero, Mr. Santos' girlfriend, was asleep with her son on a couch in Mr. Santos' living room in the 408 Summer Avenue apartment. Ms. Marrero had been to a restaurant with Mr. Santos earlier in the evening, and had been brought back by Mr. Santos to his apartment. Sometime after 1:00 a.m., Ms. Marrero was awakened by the sound of voices. Ms. Marrero left her son in the living room and saw lights from flashlights in an adjacent empty room. She walked through the empty room, into the kitchen, where she saw three officers with flashlights and guns drawn. The officers asked her who else was in the apartment, and whether she knew David Santos. They also asked her for identification. Ms. Marrero produced two forms of photo identification and one checkbook. Two of these items noted her address in Passaic, and one documented an address in Paterson. Nothing in her possession identified her home as 408 Summer Avenue. The officers had Ms. Marrero sit at the kitchen table while they searched the apartment. As the officers found narcotics and weapons, located in the bedroom closet, they put the items before Ms. Marrero and asked her what she knew about them. No drugs or drug paraphernalia were located anywhere in the kitchen. No weapons were located under the bed, or behind the door. At about 1:45 a.m. they placed a blank consent form before her and told her to sign it. Ms. Marrero was not asked to read the form, nor was it read to her. As she attempted to review the document, the officers banged their flashlights on the table and told her that if she did not sign the paper, they would notify [The Division of Youth and Family Services] and she would not see her son again. In response to

their threats, Ms. Marrero signed the consent form.

The defendants were initially taken to the Newark police precinct. Mr. Santos was questioned by Newark police officers and Agent Beckett while at the precinct, and again by Agent Beckett once he was moved to the DEA building. Mr. Santos requested counsel but was told that securing counsel would take time, and he would be unable to help in securing Ms. Marrero's release if counsel were provided. Mr. Santos was also told that if he did not make a statement, Ms. Marrero would be charged with the drug charges. At no point was Mr. Santos read his Miranda rights.

## DISCUSSION

### I. LEGAL STANDARD ON A MOTION TO SUPPRESS

■ Federal Rule of Criminal Procedure 41(h) provides that "[a] defendant may move to suppress evidence in the court where trial will occur, as Rule 12 provides." Fed. R.Crim. Pro. 41(h). Rule 12 provides that suppression motions should be made prior to trial. *See* Fed. R.Crim.P. 12(b)(3)(C). The burden is on the defendant to establish the necessity for the hearing. *U.S. v. Foster*, 287 F.Supp.2d 527 (D.Del.2003) (citing *U.S. v. Rodriguez*, 69 F.3d 136, 141 (7th Cir.1995)).

The Fourth Amendment right to be free from unreasonable searches and seizures is a personal right and a defendant must establish standing in order to assert that right. *See U.S. v. Padilla*, 508 U.S. 77, 81–82, 113 S.Ct. 1936, 123 L.Ed.2d 635 (1993). Once standing is established, a defendant who files a motion to suppress ordinarily carries the burden of proof. *United States v. Acosta*, 965 F.2d 1248, 1257 n. 9 (3d Cir.1992)(citing *Rakas v. Illinois*, 439 U.S. 128, 130 n. 1, 99 S.Ct.

421, 58 L.Ed.2d 387 (1978)). However, where a search is conducted without a warrant, as is the case here, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the warrantless search was conducted pursuant to one of the exceptions to the warrant requirement. *U.S. v. Hebron*, 243 F.Supp.2d 90 (D.Del.2003)(citing *U.S. v. Herrold*, 962 F.2d 1131, 1137 (3d Cir. 1992)). In determining whether a waiver was voluntarily given, an enumerated exception to the warrant requirement, a court must consider the totality of the circumstances. *U.S. v. Hollis*, 387 F.Supp. 213 (D.Del.1975) (citing *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969)).

### II. ANALYSIS

#### A. *Initial Stop*

This Court must first determine whether the officers had reasonable suspicion to stop and detain defendant David Santos, and probable cause to arrest him.

■ Detective Walker, who was in a police vehicle with Lieutenant O'Connor on the night in question, testified that as the officers drove down Summer Avenue Lieutenant O'Connor noticed that a red SUV had a hanging license plate and directed Walker's attention to the plate. (1/8/04 Tr. at 9–10.) A hanging license plate can be a sign that the plate was hastily affixed. The skewed plate, coupled with the fact that the car was located in a high crime neighborhood known for stolen cars, suggested to the officers that there was some probability that the car was stolen. Upon noticing the plate at least two officers, Lieutenant O'Connor and Detective Ojeda, observed men who were approaching the SUV pass a black bag from one individual to another. (1/8/04 Tr. at 90; 3/24/04 Tr. at 128–29.)[4] To the observing officers,

---

4. Defendant David Santos does not seek to suppress the contents of the black bag.

this appeared to be a drug transaction. As the officers moved into position Mr. Abudeye dropped several small plastic bags to the ground which were later determined to contain narcotics. (Tr. 3/24/04 at 129–30.) Together, these facts gave rise to the officers' suspicion that criminal activity was afoot. Detective Walker, however, further testified that the fact that the men approaching the car were Hispanic also contributed to his suspicion of wrongdoing.[5]

 While this Court is deeply troubled by Detective Walker's statements, this Court must assess the stop's legality on the basis of objective factors available to the officers at the time, and not an individual officer's subjective intent. *U.S. v. Hawkins*, 811 F.2d 210, 214 (3d Cir.1987) ("the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action so long as the circumstances, viewed objectively, justify that action.") (citing *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)).

In this instance, the circumstances attending the stop including the hanging license plate, passage of the bag, late hour, and high crime area, were sufficient to "warrant a man of reasonable caution in the belief that the action taken was appropriate." *U.S. v. Bonner*, 363 F.3d 213, 219 (3d Cir.2004)(quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see U.S. v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)(stops are justified where police officers have "a particularized and *objective* basis for suspecting the particular person stopped for criminal activity")(emphasis added).

 This Court finds that the officers had cause to stop the individuals for a limited period.[6] *See U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) ("Because the 'balance between the public interest and the individual's right to personal security,' . . . tilts in favor of a standard less than probable cause in such cases, the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot,' ") (citations omitted). However, the legal justification only extends to the initial investigatory stop. *See U.S. v. Brignoni–Ponce*, 422 U.S. 873, 882, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (after initial investigatory stop, and limited questioning regarding suspicious circumstances, "any further deten-

---

(4/27/04 Tr. at 9–10.) Accordingly, this Court need not address whether the police were justified in opening the bag to determine its contents.

5.

> Mr. Turano: The fact that you saw four Hispanic males walking toward the car, is that something that gave you reasonable suspicion?
> Officer Walker: Possibly, yes.
> Mr. Turano: That's reasonable suspicion on your part?
> Officer Walker: Yes.
> Mr. Turano: Four Hispanic males walking to a car?

> Officer Walker: Right.

(1/8/04 Tr. at 41.) Officer Walker later testified that his statement "has nothing to do with race." (1/8/04 Tr. at 42).

6. The Court does not arrive at this conclusion without some reservation. The hanging license plate was not noted in the initial police incident report and was only provided as justification for the stop in connection with this motion. (Gov. Exh. 1; 1/8/04 Tr. 25–27; 3/23/04 Tr. 24–25.) Further, the bag that was passed between defendants was an ordinary plastic grocery bag, not a duffle bag, or some other potentially more suspicious container. Suffice to say, the reasonable suspicion in this case hangs upon a very thin reed.

tion or search must be based on consent or probable cause.")

■ Absent evidence of illegal wrongdoing by Mr. Santos, there was no probable cause to arrest and detain him. *Ybarra v. Illinois* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (where the standard is probable cause, the search or seizure must be supported by probable cause particularized with respect to that person, the requirement cannot be undercut simply by the fact that there exists probable cause to search and seize another). According to the officers, Mr. Santos was not placed under arrest until Lieutenant O'Connor informed the officers that drugs had been found in his apartment. (1/8/04 Tr. at 34–35; 3/23/04 Tr. at 26–27; 4/02/04 Tr. at 5.) Without this evidence, the officers had no probable cause to believe that David Santos had committed, or was about to commit an offense. *See Brinegar v. U.S.*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)(probable cause exists where facts and circumstances exist that an offense has been or is being committed). Because, as discussed below, this Court finds the search of the apartment to have been illegal, the subsequent arrest of Mr. Santos, predicated on the illegal search, was also unlawful.

*B. Consent to Enter Apartment*

■ This Court is not persuaded that Mr. Santos directed the officers to retrieve his license. In fact, no officer was able to testify that they personally received instructions from Mr. Santos to enter his apartment. Rather, Detective Walker stated "[b]ased on Detective Vasquez and Ojeda, it was Mr. Santos' idea for them to go upstairs and retrieve the driver's license from his girlfriend. That's what they told me." (1/8/04 Tr. at 65). Detective Ojeda testified that Lieutenant O'Connor told him that Detective Vasquez obtained the information about the where-

abouts of Mr. Santos' license, including the address of his apartment. (3/24/04 Tr. at 188.) Detective Ojeda also testified that to his knowledge, Detective Vasquez was the only one who questioned Mr. Santos at the scene. (3/24/04 Tr. at 131.)

Officer Vasquez, however, testified as follows on the witness stand:

Officer Vasquez: He told me, my license is upstairs in me and my girl's apartment.

He never said go get it.

Mr. Turano: He never said, go get it?

Officer Vasquez: Right. He never made any statement like that to me.

(3/24/04 Tr. at 33.)

Detective Vasquez further testified that Mr. Santos did not tell him where the apartment was located. (3/23/04 Tr. at 14). While Detective Vasquez testified that he was under the impression that Mr. Santos may have provided Lieutenant O'Connor with the location of the apartment (3/24/04 Tr. at 52), he also testified that he did not personally overhear such a conversation. (3/24/04 Tr. at 51.) Moreover, Mr. Santos was never out of Detective Vasquez' sight, with the exception of ten seconds, when he put his head in the SUV to check for signs of forced entry. (3/24/04 Tr. at 50–51.) Without the benefit of Lieutenant O'Connor's testimony in this case, we are only left with the testimony of Agent Beckett, who testified that Officer Ojeda and Lieutenant O'Connor told him only that Mr. Santos had indicated that his license was upstairs with his girlfriend. Agent Beckett was never told that Mr. Santos had directed any officer to get the license. (4/2/04 Tr. at 161—62).

The following facts in the record also cast doubt on the veracity of the officers' claims. First, the officers admitted that it was possible to confirm whether Mr. Santos' possessed a valid license plate by radi-

oing to headquarters, as opposed to entering an unknown apartment in an area known for crime at one in the morning.[7] (3/23/04 Tr. 49–50.) In fact, Officer Ojeda conceded that in the vast majority of cases, license identification is checked via radio dispatch, (3/24/04 Tr. at 213.) In this instance Lieutenant O'Connor made the decision to retrieve the license from the apartment as opposed to calling in to check via radio dispatch. (4/2/04 Tr. at 59.) Detective Vasquez, however, stated that he believed that the radio dispatcher was called to determine whether the SUV was stolen. (3/23/04 at 47.) There was no satisfactory explanation provided for why the officers would not have also checked with the dispatcher as to whether Mr. Santos was licensed to drive a motor vehicle, as opposed to seeking to enter an apartment at one in the morning in a high crime area, at great risk to themselves.

The record also indicates that the outside door to the house at 408 Summer Avenue springs shut on its own (4/05/04 Tr. at 9), and automatically locks. (3/24/04 Tr. at 86–87; 4/19/04 Tr. at 21–22.) Although Officer Ojeda claims the door was open when the officers entered the building (3/24/04 Tr. at 133), again, this seems highly unlikely given the late hour, and the fact that the building was located in a high crime neighborhood.

Also, Tarrance Vincent, a witness called by the defense and a resident of Summer Avenue, testified to being in the vicinity of the apartment house on the day in question, and observing officers going to several doors on the block attempting to gain entrance with keys. This testimony corroborates Mr. Santos' and Mr. Camacho's testimony that the officers tried to gain entry to several houses on the block with the confiscated keys in an attempt to find Mr. Santos' apartment. (4/19/04 Tr. at 54–55; 4/5/04 Tr. at 58–60.) Although Mr. Vincent did not testify to the correct time at which the events in question occurred, he correctly described certain details of the officers' outfits, such as the fact that they were not in police uniforms, but rather had either blue or black pants on, and had gold patches on their jackets. (1/8/04 Tr. at 7–8; 3/23/04 Tr. at 5; 3/24/04 Tr. at 90–91.) This Court found Mr. Vincent to be a credible, disinterested witness, and believes that he simply confused the time at which the incident occurred.

This Court has also considered evidence that the word "keys" was added to the inventory list of personal property taken from Mr. Santos by the Newark police in a

---

7. It is worth noting that Officer Ojeda stated that had Mr. Santos chosen, he was free to go to his apartment and retrieve the requested license himself.

> Mr. Turano: Why not let Mr. Santos get up and go and get his driver's license?
> Officer Ojeda: It didn't happen that way.
> Mr. Turano: Detective—
> The Court: Actually, I'm sorry to interrupt you. Was there some—was there some reason that Mr. Santos couldn't have gone to his apartment at that time?
> Officer Ojeda: No, there was no reason.
> The Court: So he could have gone to his apartment?
> Officer Ojeda: Absolutely.

> The Court: He was free—I mean, he was not under arrest, he was free to do that if he chose to?
> Officer Ojeda: That's correct.
> Mr. Turano: So it's you—it's your testimony, rather than go up himself he sends two officers up to his apartment, to where he knows he's just a few doors away, where he knows that there's a tremendous amount of drugs in plain view?
> Officer Ojeda: That's what occurred, sir.

(3/24/04 Tr. at 210–11.)

Officer Ojeda's contention that Mr. Santos was free to go to the apartment himself was contradicted by the testimony of Officer Vasquez (3/23/04 Tr. at 27), David Santos (4/19/04 Tr. at 46), and Victor Camacho (4/5/04 Tr. at 57–58).

different color ink than that of the other eight items that were recovered and listed before the final entry, "keys". (3/23/04 Tr. at 61–62.) The property was inventoried at the police precinct on the same night that Mr. Santos was taken into custody. (3/23/04 Tr. at 61,63.) Detective Vasquez testified that he prepared the inventory report, placed the contents in the property bag, and sealed the bag. (3/23/04 Tr. at 63–64.) However, upon examination, the bag was unsealed. (3/23/04 Tr. at 61.) It appears to this Court that an officer added the keys to the evidence bag after the other property was inventoried. This lends credence to the theory that the officers took the keys from Mr. Santos at a different time (namely at the scene of the arrest to gain entry to the apartment), rather than when they took the rest of the property on Mr. Santos' person. *See* 4/19/04 Tr. at 72 (testimony of Mr. Santos stating that the property on his person, such as jewelry, etc. was taken at the precinct).

Finally, this Court notes the fact that it strains credulity to believe that Mr. Santos would have sent police officers to an apartment full of drugs and weapons to retrieve a driver's license; particularly when the penalty for not having a driver's license amounts to at most a fine. Additionally, there is no testimony from either party to lead one to believe that any other inducement existed requiring Mr. Santos to retrieve his license.

This scenario becomes even more implausible when coupled with the uncontested fact that Mr. Santos had a driver's permit in his pocket throughout the period he was detained, the only type of driver's license which he owned. (Gov. Exh. 8/Def. Exh. 2; 1/8/04 Tr. at 71; 4/19/04 Tr. at 34.)

The evidence considered in its totality leads this Court to conclude that the officers entered Mr. Santos' apartment dwelling without any authorization from Mr. Santos to do so. It is evident that the officers were not on a mission to procure Mr. Santos' driving credentials, but rather sought to confirm their suspicion that Mr. Santos was a drug dealer. The officers broke the law when they seized Mr. Santos' keys without his permission and used them to gain access to his apartment dwelling. The fact that Mr. Santos, indeed, appears to have been involved in illegal drug trade does not negate the fact that the officers' actions constituted an egregious violation of Mr. Santos' constitutional rights. *See Bell v. State of Md.,* 378 U.S. 226, 328, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964) ("The worst citizen no less than the best is entitled to equal protection of the laws of his State and of his Nation.").

## C. Consent to Search Apartment

■ As discussed above, the officers contend that they gained access to Mr. Santos' apartment by knocking on the door whereupon Ms. Marrero opened the door. The officers concede that they did not announce themselves when knocking on the door.[8] The government contends that when Ms. Marrero opened the door, the officers saw in plain view a large variety of narcotics on the kitchen table. Again, the officers' testimony is implausible.

First, Mr. Santos' apartment had two doors, one door that entered into the kitchen, and one door that entered into the

---

8.
The Court: What's the reason for not identifying yourself. Is there some police procedure for that?
Officer Ojeda: I was assisting the Lieutenant, Sir.

The Court: Forget about that. What's the reason you didn't identify yourself?
Officer Ojeda: Because I didn't.
The Court: Okay.
(4/02/04 Tr. at 12.)

living room. It is unlikely that Ms. Marrero would open the door to the room where a large stash of narcotics was located on a kitchen table that was in clear view of the door at 1 a.m. in the morning. Further, both Ms. Marrero and Mr. Santos testified that the narcotics were contained in shoe boxes that were kept in the bedroom closet. (4/16/04 Tr. at 34; 4/16/04 Tr. at 28–29.) While officers allege that the narcotics were found in plain sight, and were not contained in shoe boxes, four shoe boxes were listed on the inventory report. (4/26/04 Tr. at 79–81.) [9]

Viewing the record in totality, this Court finds that the officers gained entry onto the premises by using Mr. Santos' confiscated keys, and that consequently, any contraband that was discovered was not found in plain view. This leads this Court to the question of whether Ms. Marrero's signing of a consent to search form vitiated the unlawful nature of the officer's entry. Putting aside the question of whether Ms. Marrero had apparent or actual authority to consent to a search of Mr. Santos' apartment [10], this Court finds that her consent, in any case, was not voluntarily given.

■ The Fourth Amendment protects against unreasonable searches and seizures, however, a search is not unreasonable if a person with a privacy interest in the items being searched gives free and voluntary consent. The government has the burden of proving, through "clear and positive testimony" that the consent to search was given voluntarily. *Schaffer v. Anderson*, 224 F.Supp. 184, 186–87 (D.Del. 1963). Consent is voluntary when it is

unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion. Voluntariness is determined by examining the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

■ Ms. Marrero testified that she was told that if she did not sign the consent form, the officers would put all the charges and drugs on her, and that she would lose her child. (4/16/04 Tr. at 22–23, 37.) She also testified that the officers banged their flashlights on the table at which she was sitting, and did not give her an opportunity to read the consent form. In fact, the form was not filled out with respect to location, witnesses, and other items when she signed it. (4/16/04 Tr. at 35). Although Ms. Marrero's testimony was contradicted by Officer Ojeda, this Court finds her testimony credible.

Under the totality of circumstances, this Court finds that Ms. Marrero's consent was not voluntarily given, and rather was a product of police coercion. The coerced environment created by the threat of having a small child removed from a parent's custody cannot be overstated. *See U.S. v. Ivy*, 165 F.3d 397 (6th Cir.1998) (finding that police officer's obtaining of individual's signature on a consent form through threats of arresting the individual and taking her child constituted "objectively improper police action"). The threat, coupled with the statement that if she did not cooperate drug charges would be brought against her, and the banging of the flashlights on the table at 1 a.m. in the morning while a six-year old child was sleeping in the other room, together created a coer-

**9.** "Item No. 87 is listed as Boxes (Shoe Boxes) used to carry CDs recovered from kitchen table." Decl. of Stephen Turano, Esq. at Ex. D, Property & Evidence Receipt.

**10.** Testimony has been given that Ms. Marrero did not regularly stay in Mr. Santos' apart-

ment, and was not on the lease. In order to have a valid consent to search, the consent must be given by an individual with an independent right to consent to the search. *United States v. Mazurkiewicz*, 431 F.2d 839, 842 (3d Cir.1970).

cive environment such that Ms. Marrero's consent to search the apartment must be deemed involuntary. Because this Court does not find that drugs and weapons were found in plain view at the 408 Summer Avenue apartment, all evidence seized from the apartment is suppressed.

### D. Statements Made by Mr. Santos While in Custody

█ This Court, finding that the search and seizure of contraband found in Mr. Santos' apartment was illegal, and the arrest occasioned by the seizure also illegal, must now determine whether the subsequent statements made to Agent Beckett by Mr. Santos should also be suppressed as the "fruit of the poisonous tree", or whether they are sufficiently attenuated from the constitutional violations that preceded them. This determination relies on the consideration of three factors, namely "the temporal proximity of the arrest and confession, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (citations omitted).

██ Mr. Santos made two statements to Agent Beckett once taken into custody. The first statement was given a few hours after his arrest in the Newark police precinct. (4/19/04 Tr. at 76, 78; 4/2/04 Tr. at 121–22.) Agent Beckett testified that he did not give Miranda warnings to Mr. Santos at this time because he had been told by Lieutenant O'Connor that Mr. Santos had already been mirandized. (4/2/04 Tr. at 122.) Several hours later, in the late afternoon of August 3rd, Mr. Santos was transferred to the DEA building where he was questioned by Agent Beckett. Agent Beckett's partner, Cliff Spencer, and Officer Vasquez were also present. (4/2/04 Tr. at 128.) At this time, Mr. Santos was read Miranda warnings, and subsequently made incriminating state-ments regarding his procurement of the narcotics, and provided information about his source.

It is clear to this Court that Mr. Santos' first unwarned statement is inadmissible given its close proximity to the initial illegal arrest, and the lack of any intervening circumstances sufficient to purge the taint of the initial search and seizure of drugs and weapons in the apartment. The second statement is also inadmissible. Although such factors as intervening time, removal of the prisoner to a different place, and change in identity of interrogators can make a second, warned statement voluntary, despite even a prior involuntary statement, this Court does not find these factors present in this case. *Oregon v. Elstad*, 470 U.S. 298, 310, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (noting passage of time, change in location, and change in identity of interrogators, as factors relevant to determination of whether second confession is tainted by initial illegally coerced prior statement).

First, although the second interview took place in the DEA building, Officer Vasquez, one of the arresting officers, was present. Second, although 18 hours separated the statement from the initial arrest there was no "clean break" between the time of the arrest and statement. *U.S. v. Daniel*, 932 F.2d 517, 521 (6th Cir.1991)(statement admissible where there was a "clean break" from the circumstances surrounding the first, allegedly coerced statement). This is not a situation, like that in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), where the defendant was released and returned voluntarily to make further statements to the police. Not only was Mr. Santos not released, but he was not provided with a bed. Consequently, the interval between the arrest and statement was not interrupted with an

opportunity to sleep. (4/19/04 Tr. at 58–59.)

Most importantly, Mr. Santos' statements were made to protect Ms. Marrero from prosecution. While confessions which law enforcement procures that are motivated by a desire to protect a third party do not necessarily undermine the voluntary nature of such confessions; in this case such circumstances demonstrate the intimate connection between the illegal seizure of evidence from the apartment, and Mr. Santos' subsequent statements. "The central question is whether 'the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Brown* at 599, 95 S.Ct. 2254 (citing *Wong Sun* at 487–88, 83 S.Ct. 407).

Agent Beckett testified that "It appeared that [Mr. Santos] didn't want to speak to me, but he had some concerns about his girlfriend ... He basically was concerned for Ms. Marrero's well-being, whether or not she was going to be charged with what was found. He basically—his cooperation was contingent on whether or not I would be able to help her out." (4/2/04 Tr. at 122–123.) Agent Beckett noted Ms. Marrero was a topic at both conversations with Mr. Santos. (4/05/04 Tr. at 15.) Agent Beckett also stated that he told Mr. Santos that Ms. Marrero was looking at spending 10 years in jail. (4/05/04 Tr. at 15.) Such statements were directly related to the quantity of drugs found in Mr. Santos' apartment, drugs which were illegally seized.

The government cites *Thompson v. Haley*, 255 F.3d 1292 (11th Cir.2001) for the proposition that statements made by Mr. Santos in an effort to help himself and his girlfriend should not be deemed involuntary. In *Thompson*, the defendant made incriminating statements when he was told that his girlfriend might go to the electric chair for a murder he had committed if he did not confess. The 11th Circuit held that such statements were voluntary. *Thompson* is distinguishable from the instant case because the officers in *Thompson* had probable cause to arrest the girlfriend for the commission of the crime. Those facts are not present here.

When Mr. Santos made statements solely motivated by his desire to spare Ms. Marrero from being charged with possession of drugs, the illegality of the officers' search and seizure of those drugs was exploited. Accordingly, these statements must be suppressed.

. . . . .

This case brings to mind Justice (then Judge) Cardozo's well-known adage, "[t]he criminal is to go free because the constable has blundered." *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585 (N.Y.1926). To be sure, this Court does not relish the prospect of seeing an individual released who has, and may well in the future, prey upon society. However, this Court will not allow the principles articulated by the Fourth Amendment to be clouded by the identity of the individual whose rights were violated. Law enforcement must perform its duties within the bounds set forth by the Constitution. The officers in this case, by forcibly taking Mr. Santos' keys, illegally entering his apartment, and coercing Ms. Marrero into signing a consent to search form, acted as though they were above the law. Such conduct will not be countenanced.

## CONCLUSION

For the reasons set forth above, Defendants' motions to suppress evidence seized at Mr. Santos' apartment at 408 Summer Avenue is granted. Defendant David Santos' motion to suppress statements ob-

tained in connection with the illegal search is also granted.